ORAL ARGUMENT HELD SEPTEMBER 29, 2017

No. 15-1344

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

International Longshore & Warehouse Union,
International Longshore & Warehouse Union, Local 8, *and*
International Longshore & Warehouse Union, Local 40

Petitioners/Cross-Respondents

*v.*

National Labor Relations Board

Respondent/Cross-Petitioner

*and*

ICTSI Oregon, Inc.

Intervenor

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

_____

## ILWU'S PETITION FOR *EN BANC* REHEARING

_____

ROBERT REMAR (SBN 100124)        EMILY MAGLIO (SBN 267190)
LAW OFFICE OF                    LEONARD CARDER, LLP
ROBERT REMAR                     1188 Franklin St Suite 201
1188 Franklin St 4th Floor       San Francisco, CA 94109
San Francisco, CA 94109          Tel: (415) 771-6400
Tel: (510) 499-1570              Fax: (415) 771-7010
rremar@remarlaw.com              emaglio@leonardcarder.com

*Counsel for Petitioners ILWU, ILWU Local 8, and ILWU Local 40*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY .......................................................................... iv

I.     INTRODUCTION (RULE 35(b) STATEMENT) ................................... 1

II.    BACKGROUND ............................................................... 5

III.   REASONS FOR GRANTING REHEARING EN BANC ......................... 7

CERTIFICATE OF COMPLIANCE .................................................. 18

ADDENDA TO PETITION ........................................................... 19

     1.    Copy of Panel's Judgment .................................................. 19

     2.    Copy of Board Decision, ILWU (ICTSI), 363 NLRB No. 12 (September 24, 2015) .................................................. 20

     3.    Certificate as to Parties, Rulings and Related Cases ......................... 23

     4.    Corporate Disclosure Statement ........................................... 54

CERTIFICATE OF SERVICE ........................................................ 55

i

# TABLE OF AUTHORITIES

**Federal Cases**

*American President Lines, Ltd. v. ILWU, Alaska Longshore Division*,
611 F. App'x 908 (9th Cir. 2015) .................................................................... 1, 13

*American President Lines, Ltd. v. ILWU, Alaska Longshore Division, Unit 60*,
997 F. Supp. 2d 1037 (D. Alaska 2014) .................................................... 1, 13, 14

*American President Lines, Ltd. v. ILWU, Alaska Longshore Division, Unit 60*,
721 F.3d 1147 (9th Cir.2013) ........................................................................ 13, 14

*American Trucking Association, Inc. v. NLRB*,
734 F.2d 966 (4th Cir. 1984) ................................................................... 1, 10, 15

*California Cartage Company v. NLRB*,
822 F.2d, 1203 (D.C. Cir. 1987) .................................................................... 1, 13

*ILA v. NLRB*,
613 F.2d 890 (D.C. Cir. 1979) ............................................................. 1, 4, 8, 9, 15

*NLRB v. Enterprise Ass'n of Pipefitters*,
429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) .......................................... 3, 13

*NLRB v. Longshoremen's Ass'n*,
447 U.S. 490 (1980) ..................................................................................... 4, 5, 9

*NLRB v. Longshoremen's Ass'n*,
473 U.S. 61 (1985) ....................................... 1, 2, 3, 5, 7, 8, 10, 11, 15

*U.S. v. Pacific Maritime Association*,
229 F.Supp.2d 1008 (N.D. Cal. 2002) ...................................................................2

**NLRB Cases**

*ILWU (Cal Cartage)*,
   278 NLRB 220 (1986)........................................................................ 11, 12, 15

*ILWU (ICTSI)*,
   63 NLRB No. 12 .......................................................................... 19, 21

*Longshoremen ILA (New York Shipping Ass'n)*                ,
   266 NLRB 230 (1983)................................................................. 10, 16

**Federal Statutes**

29 U.S.C. § 158....................................................................................3

**Federal Rules**

Federal Rule of Appellate Procedure 26.1................................................22

Federal Rule of Appellate Procedure 28.1........................................ 18, 20

Federal Rule of Appellate Procedure 32................................................18

# GLOSSARY

| | |
|---|---|
| Board or NLRB | National Labor Relations Board |
| IBEW | International Brotherhood of Electrical Workers, Local 48 |
| ICTSI | ICTSI Oregon, Inc. |
| *ILA I* | *NLRB v. Longshoremen's Ass'n, 447 U.S. 490 (1980)* |
| *ILA II* | *NLRB v. Longshoremen's Ass'n, 473 U.S. 61 (1985)* |
| ILWU | International Longshore and Warehouse Union |
| NLRA | National Labor Relations Act, 29 U.S.C. §§ 151, et seq. |
| PCLCD | Pacific Coast Longshore Contract Document |
| PMA | Pacific Maritime Association |
| Port | Port of Portland |
| Reefers | Refrigerated shipping containers |
| Reefer Work | The work of plugging, unplugging, and monitoring refrigerated shipping containers |
| T-6 | Terminal 6 in the Port of Portland |

## <u>INTRODUCTION (RULE 35(b) STATEMENT)</u>

The Panel Decision, and the underlying Board decision it enforces, in holding that ocean shipping carriers[1] lack what has been their traditional "right to control" the work done on their own cargo containers because of contrary terms in a marine terminal lease to which they are not parties, conflict with *NLRB v. International Longshoremen's Association ("ILA II"), 473 U.S. 61 (1985)* and the decisions of this Circuit, *California Cartage Company v. NLRB,* 822 F.2d, 1203, 1206 (D.C. Cir. 1987), *enforcing in pertinent part*, *Longshoremen ILWU (Cal Cartage)*, 278 NLRB 220, 223-224 (1986), and *ILA v. NLRB*, 613 F.2d 890 (D.C. Cir. 1979), *affirmed*, *NLRB v. International Longshoremen's Association ("ILA I"), 447 U.S. 490 (1980)*, making necessary a full court consideration to secure uniformity. The Panel and Board decisions also conflict with decisions in other circuits, *American Trucking Association, Inc. v. NLRB, 734 F.2d 966 (4th Cir. 1984), aff'd, ILA II, supra,* and, *American President Lines, Ltd. v. ILWU, Alaska Longshore Division, 611 F. App'x 908 (9th Cir. 2015) (unpublished), affirming, 997 F. Supp. 2d 1037 (D. Alaska 2014)*, concerning exceptionally "important questions of law, economics, and public policy," *American Trucking*, 734 F.2d at 977, -- whether ocean shipping carriers

---

[1] The cases use different terms interchangeably, including "ocean carriers," "shippers," "shipping companies," "lines," "steamship lines," "shipowners," and "carriers," to describe the category of companies that operate ocean vessels to transport cargo in metal containers they own or lease throughout their international and domestic trade routes.

retain their previously established "right to control" the work performed in U.S. ports on the shipping containers, including refrigerated containers (called, "reefers"), that they own or lease, to allow for work preservation agreements with their port unions (here ILWU) that contain "negotiated compromise[s] of a volatile problem bearing directly on the well-being of our national economy," *ILA II*, 473 U.S. at 84; the "volatile problem" affecting the "national economy concerns the extent to which longshore job losses from new technologies (here, robotics) can be mitigated by assigning functionally-related work, such as the disputed "reefer work,"[2] to longshoremen. While the instant matter involves West Coast ports, which "are crucial gateways to America's trade routes to Asia and the Pacific, annually handling over 50 percent of the nation's containerized imports and exports," *U.S. v. Pacific Maritime Association*, 229 F.Supp.2d 1008, 1009-10 (N.D. Cal. 2002), the conflicting authority generated by the Panel and Board Decisions equally impact all U.S. ports and international trade.

The maritime industry, starting in the middle of the 20th Century, developed collective bargaining solutions for preservation of longshore work to curtail job losses from containerization, the "new" labor-saving technology of that era. This generated extensive caselaw that ultimately affirmed, pursuant to the "work

---

[2] "Reefer work" is the plugging, unplugging and monitoring of dockside reefers while in the course of the ocean shippers' trade routes.

preservation doctrine," the legality under the NLRA of such agreements, like the one at issue here. Under the doctrine, a union's efforts to enforce such agreements do not violate § 8(b)(4)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(B), if the employer has the "right to control" assignment of the work. *NLRB v. Enterprise Ass'n of Pipefitters*, 429 U.S. 507 (1977). In *ILA II*, the Supreme Court characterized *Pipefitters* as reaffirming "that so long as the 'right to control' test is satisfied, it will not normally violate § 8(b)(4)(B) to engage in activity against one's own employer 'for the purpose of preserving work traditionally performed by union members even though in order to comply with the union's demand the employer would have to cease doing business with another employer.'" 473 U.S. 61, 77, n. 16, *quoting*, 429 U.S. at 510. In all the longshore cases cited above, which we assert conflict with the Decisions of the Panel and Board here, the Ocean Carriers and their multi-employer bargaining associations were found to have "right to control" the work performed on the containers they own or lease, despite contrary contractual terms and arrangements with all manner of terminals, freight stations, warehouses, trucking companies and other waystations along the Carriers' trade routes.

The maritime employers and unions throughout the country have "relied on the work preservation doctrine [as defined in the above longshore cases] to guide their bargaining…. [necessitating that this Circuit] follow the normal presumption of *stare decisis* in cases of statutory interpretation." *ILA II*, 473 U.S. at 84. The Panel

and Board Decisions, holding that Ocean Carriers and their bargaining association now lack such "right to control" in the face of a Port's contrary terminal lease, to which they are not even parties, overturn this legal predicate for the nation's longshore work preservation agreements, present and future. The Panel and Board Decisions likewise fail to "be informed by an awareness of the congressional preference for collective bargaining as the method for resolving disputes over dislocations caused by the introduction of technological innovations in the workplace." *ILA I*, 447 U.S. at 511.

Such departure from precedent severely destabilizes collective bargaining in an industry of crucial importance to national and world commerce. This is not just the view of ILWU. It is shared by the 70 or so West Coast longshore companies, as reflected in their Amicus Brief filed with the Panel in support of ILWU's initial petition for review. (See, Document #1621962, filed: 06/27/2016). The unprecedented holding of the Panel and Board Decisions ensures turmoil and uncertainty in the future administration and negotiation of the nation's longshore labor contracts, which directly undermines the NLRA's primary goal of labor-management peace and bargaining stability. *ILA v. NLRB*, 613 F.2d at 903 ("unwarranted interference by the NLRB and the courts could inject a massive dose of uncertainty into the planning functions of both management and labor.") If the Ocean Carriers' "right to control" can be so easily overridden by a lease not even of

their making, then this would consequently "require that unions block progress by refusing to permit any use at all of new technology in order to avoid the prohibitions of §§ 8(b)(4)(B) and 8(e)." *ILA II*, 473 U.S. at 77, citing *ILA I* at 506. The Panel and Board's departure from binding precedent and misapplication of the "right to control" test necessitates *en banc* rehearing.

## BACKGROUND

This case arises from a dispute at Terminal 6 ("T-6") in the Port of Portland ("Port") concerning the assignment of dockside reefer work, which the West Coast employers, represented by Pacific Maritime Association (PMA), the multi-employer bargaining group, in an ILWU coastwide longshore bargaining unit, have assigned to longshoremen under work preservation provisions in the ILWU-PMA Pacific Coast Longshore Contract Document (PCLCD). PMA Ocean Carriers (*e.g.*, Hanjin Shipping Lines, LCC and Hapag Lloyd, Inc.), owned and temporarily released approximately 98 percent of the containers and reefers at T-6 for continued transport through their trade routes. (JA-91-92, 360-61)

Until 2010, the Port, which is not a PMA-member, operated T-6 under stevedoring Carrier Contracts with the PMA-Carriers, whereby the Carriers released under specified conditions their containers and reefers for the Port's temporary handling as part of their international trade routes. (JA-309-10, 474-75, 836-51, 1236-81). In 2010, the Port terminated all business dealings with the PMA Carriers

and assigned the Carrier Contracts to ICTSI of Oregon, Inc., which joined PMA and became signatory to the PCLCD. (JA-345, 486-87, 1187-1235; PCLDC § 1.82)

ICTSI operated T-6 under a property lease with the Port, which provided for Port electricians, represented by IBEW Local 48, to continue the decades-long practice from when the Port had contracted with the PMA-Carriers, of performing the reefer work in the middle of longshore operations staffed by ILWU longshoremen. (JA-2169) The PMA-Carriers were not parties to the lease and made no such agreement to have IBEW electricians continue to do the reefer work on their containers. (JA-138-39, 343-44, 366-67, 1187-1235, 1361-62) When it withdrew from the Carrier Contracts, the Port did not reserve or secure with the PMA-Carriers any provision giving it *any* ongoing right to perform the dockside reefer work or otherwise handle the Carriers' reefers. (JA-351, 436-39, 1388) The PMA-Carriers who own or lease nearly all the reefers at T6, (JA-434) exercise direct control over the work performed on them. (JA-499-500) They "determine not only where [the containers are] going to go, but how their equipment is to be handled, what is to be done with their equipment. Is it to be loaded, is it not to be loaded." (JA-500; 225-43, 250-87, 462-63, 1398-1447) Neither ICTSI nor the Port own or lease any containers. (*Id*.)

After months of grievance-processing under the PCLCD, in June 2012, ILWU obtained rulings from an industry arbitrator and the Joint Coast Labor Relations

Committee (CLRC), the highest labor-management body that adjudicates longshore contract disputes, ordering that the reefer work be performed by ILWU longshoremen under the longshore work preservation provisions, which were added in 2008 to offset longshore job losses from robotics at port terminals. (JA-492, 2174; PCLCD § 1.72)  ILWU longshoremen then engaged in various job actions to enforce these orders.

From the start, the Carriers have demanded that ICTSI and Port stop interfering in their assignment of reefer work to longshoremen or they "will make alternative plans." (JA-507-530, 126-129, 1393-97) When this was rejected, PMA-Carriers responded by bypassing T6 and withholding delivery of their containers there for a time until the Board obtained a court injunction against the work assignment and job actions. (JA-129, 352)

Without even mentioning any of the longshore cases, the Board rejected ILWU's work preservation claim, finding the reefer work to be outside traditional longshore work and that the PMA-Carriers lacked "right to control" the reefer work due to the Port-ICTSI lease. The Panel affirmed in a short, unpublished Judgment on the second ground, citing, without analysis, *ILA I*.

## <u>REASONS FOR GRANTING REHEARING EN BANC</u>

The Panel and underlying Board rulings that the Port's T-6 lease gives it "right to control" the reefer work conflicts with the decisions of this Circuit and the Fourth

Circuit, as affirmed by the Supreme Court in the *ILA* cases, and this Circuit's later decision in *Cal Cartage*, concerning the same ILWU-PMA West Coast bargaining unit.

Starting with *ILA v NLRB*, this Circuit directly rejected the analysis now adopted by the Panel and Board Decisions here -- that contracts with third parties, involved in the ocean shipper's trade routes, trump or override the ocean shippers' "right to control" their containers and the work performed on them. In so ruling, the *ILA* panel noted that the facts showing "right to control" are fairly uniform among the many longshore industry cases and that the issue concerned the proper legal analysis under the work preservation caselaw. *ILA v. NLRB*, 613 F.2d at 913 ("This is the fourth circuit to adjudge the validity of the Rules on Containers or of action seeking to enforce the Rules, and the factual backgrounds of these cases overlap to a significant degree…. [O]ur conflict with the NLRB is exclusively focused on the Board's misinterpretation and misapplication of the prevailing law the doctrine of work preservation.") The Circuit further observed that "[t]he Supreme Court has consistently maintained that NLRB rulings should not be sustained by reviewing courts where those rulings rest on 'erroneous legal foundations.'" *Id*. (citations omitted.)

With respect to "right to control," the Circuit in *ILA* held that the ocean shipping lines (referred to therein as "shippers") "controlled the disposition of all the

containers at issue…. [because] when the relevant [ILA-management] Container Committees found the shippers in violation of the Rules and fined them, the shippers, after unsuccessfully seeking indemnification from the truckers and consolidators, simply refused to supply their containers to the truckers and consolidators so that the Rules would be complied with that is, so that ILA labor would do the work if the work were to be done." 613 F.2d at 913-914. The Circuit further held that the competing contractual rights and arrangements with third parties, such as owners of container freight stations, warehouses and trucking lines, did not "impair" the shippers' preeminent "right to control" the work done on the containers they owned or leased. The Circuit reasoned that "the shipper can simply refuse to release a container to a trucking company or consolidator…. [and u]nless the shippers turn over the containers, as they ultimately chose not to do in the cases before us, this "right" is without substance." *ILA v. NLRB*, 613 F.2d at 913, n. 190. The Circuit's legal analysis was affirmed by the Supreme Court, without comment as to the "right of control" issue. *ILA I,* 447 U.S. at 512-513.

On remand from the Supreme Court in *ILA I,* the Board adopted the Circuit's legal analysis and rejected the argument, which the Panel and Board now espouse, that pre-existing contractual rights of third parties override the shippers' "right to control" the work on their containers. The *ILA* Board found that the argument "ignores two critical truths:"

> The first relates to timing and the fact that the choice exercised by shippers, importers, and their agents matures only after the technology is made available to them. The second relates to the origin of the technology and the fact that options made available to shippers, consignees, and their agents are not of their own design, but have been made possible by the innovation action of the various employers bound to the Rules. Thus, the oversea container is the main spring of a technology finding its origin within the primary work units.

*ILA*, 266 NLRB 230, 261 (1983). The Board further explained:

> [A]s the job guarantees embodied in said Rules take effect as a precondition to release of containers, said obligations are imposed upon signatory employers at a time when the latter possess power to comply. In other words, the contractual assignment to the ILA operates as a prior restraint upon shippers, importers, or their agents who would choose to utilize containers owned or leased by steamship companies in violation of the latter's obligation to deep sea ILA labor.

*ILA*, 266 NLRB at 261.

The Fourth Circuit affirmed the Board's legal analysis, with the stern injunction, "the argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit." *American Trucking*, 734 F.2d at 978. In particular, the court held that "although the shipping companies release containers to shippers, importers, and their agents by virtue of contractual arrangements, the companies own or lease the containers and can therefore prescribe the conditions under which they may be released…. [and]

that under such circumstances the 'right of control' resides with the shipping companies, the parties to the Rules." *American Trucking*, 734 F.2d at 976-977.

In the Supreme Court's second review in *ILA II*, though the "rationale" for the *Pipefitters'* "right to control" test was "not directly implicated," the court noted that "the ALJ, Board, and Court of Appeals have unanimously concluded that the longshoremen's employers, marine shipping companies, have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers." From this, the court specifically concluded "[t]hus the *Pipefitters* test is satisfied here." *ILA II*, 473 U.S. at 74, n.12.

Thereafter, in *Cal Cartage*, the D.C. Circuit applied the holdings from the above cases to uphold similar ILWU-PMA work preservation agreements, affirming the Board's underlying ruling there that the PMA ocean shipping companies possess ultimate "right to control" the work performed on their containers in the West Coast longshore industry, which is involved here. Concerning the PMA steamship companies' "right to control" the work performed on their own containers at various locations, the Board had found:

> The containers are owned or leased by the steamship companies. Those companies control the use of the containers. The steamship companies typically provide for the initial loading and unloading of the containers by contracting with container freight stations for the performance of this work. The steamship companies refer their customers to the container freight stations and charge the shippers a tariff rate that includes the cost of containerization.

*ILWU (California Cartage),* 278 NLRB 220, 223 (1986). Accordingly, the Board had concluded, "Since the record shows that [ILWU's] refusal to handle cargo in an attempt to enforce the [work preservation] Supplements was directed at containers owned or leased by PMA-member steamship companies, we find this conduct not to be violative of Section 8(b)(4)(i) and (ii)(B)." 278 NLRB at 224.

However, the *Cal Cartage* Board further held that PMA steamship companies lacked the "right to control" containers owned by "non-PMA" companies. 278 NLRB at 223. The Board found ownership of the containers and its resulting power to prescribe the conditions for their release to third parties, such as container freight stations, to be the "critical distinction" between lawful application of work preservation agreements on containers owned by PMA-member companies and unlawful application on containers owned by "non-PMA" companies:

> Such a distinction is critical in assessing whether the immediate employer, here the PMA member, would have the power to control the assignment of the work sought. In *NLRB v. Longshoremen ILA*, the Board found that the signatory employers could control the assignment of this work by prescribing the conditions for the release of their containers to nonmembers. Here, there is no showing that the PMA members would have such initial control over any containers nonmembers own.

*ILWU (California Cartage)*, 278 NLRB at 223-224.

While this Circuit affirmed the *Cal Cartage* Board's "right to control" analysis as to containers owned or leased by PMA companies, it found that the record

did "not clearly disclose as much of an operational difference between members and nonmembers of PMA as the Board's opinion suggests…." [and that i]t may well be, then, that PMA does indeed have some control over non-PMA members' assignment of work, or that those steamship companies in fact have some control over PMA itself, or both." *California Cartage Co. v. N.L.R.B.*, 822 F.2d at 1210. Accordingly, the Circuit held that "[t]he Board's opinion does not… adequately explain… the distinction between member and non-member steamship companies…." *Id*. at 1211. The Circuit also instructed the Board to observe on remand that "consideration of the formal indicia of control here ought not end the Board's [NLRA] inquiry." *Id*. at 1210:

> A signatory employer's absence of control over the work sought… is clearly not the only evidence that can shed light on the relationship between the signatory employer and the one the agreement was intended to influence. Although the Board decides the weight to be assigned the absence of control, *see Pipefitters,* 429 U.S. at 524, 97 S.Ct. at 901, the Supreme Court also made clear in *Pipefitters* that the Board cannot ignore other evidence of the signatory employer's neutrality *vel non*.…

*Id*. at 1210-11.

More recently, the Ninth Circuit applied *Cal Cartage's* "right to control" analysis in an unpublished opinion, affirming a district court's grant of summary judgment on the legality of ILWU's work preservation agreement in Alaska. See, *American. President Lines, Ltd. v. ILWU*, 611 F. App'x 908, 911 (9th Cir. 2015),

*affirming*, 997 F. Supp. 2d 1037, 1046 (D. Alaska 2014).[3] There, the circuit specifically affirmed the district court's ruling that APL, an ocean shipping line, possesses "right to control" work done on its containers, based on the similar findings in *Cal Cartage,* because it "control[s] where APL's containers go, when they go, how many go, where they go when they get there, and who takes them there." *Id*. The district court had found such "right to control," even though APL was operationally and contractually reliant on Samson, a barge operator, to transport APL containers to the small Alaska ports, which APL vessels cannot access. *Id*., 997 F.Supp.2d at 1040. Nor was APL's "right to control" impaired by Samson's contractual right under its "connecting carrier agreement" with APL to use its own barge employees to load and unload APL containers between its barge and the dock pursuant to Samson's collective bargaining agreement with another union. *Id*.

The above authorities directly refute the Panel's terse affirmance of the Board's holding here that "'[t]hough it is true that the carriers own or lease all of the reefers, they purchase available terminal services necessary to load, unload and store

---

[3] In its earlier, published decision in *American President Lines, Ltd. v. ILWU, Alaska Longshore Division, Unit 60*, 721 F.3d 1147 (9th Cir.2013), the Ninth Circuit had reversed the district court's grant of summary judgment against APL based on supposed lack of standing. The circuit rejected the district court's ruling that APL lacked standing because it "is attempting to litigate issues—whether the Seward work was fairly claimable by ILWU and whether APL had a right to control that work—that have already been decided through arbitration which the parties agreed would be binding." *Id*. 721 F.3d. at 1153. The circuit directed the lower court to rule on the merits as to work preservation and "right to control."

their containers from the terminal owners or operators…. [and that] when the Port [of Portland] leased [the Terminal 6] container operation to ICTSI, it carefully reserved the historical practices that developed over the years with respect to the work performed by [IBEW]" and "[n]o evidence shows that the Port ever relinquished its control at any time to anyone . . . to perform the dockside reefer work." Judgment at *2.

In so ruling, the Panel repeated the Board's error of ignoring the contrary rulings from the authorities above and failing to consider that the Port's supposed "right to control" the reefers flowed from the PMA-Carriers' power to release them to the Port and ICTSI. The Panel and the Board also failed to observe what the above authorities all hold – that the ocean shipping companies' "right to control" the work done on containers they own is not impaired by pre-existing contractual rights or arrangements enjoyed by third parties because the lines "can simply refuse to release a container to" a recalcitrant third party, like the Port here, whose supposed "right of control" "is without substance" "[u]nless the shippers turn over the containers." *ILA v. NLRB*, 613 F.2d at 913, n. 190. See also, *American Trucking*, 734 F.2d at 976-977 ("although the shipping companies release containers to shippers, importers, and their agents by virtue of contractual arrangements, the companies own or lease the containers and can therefore prescribe the conditions under which they may be released"), *affirmed*, *ILA II*, 473 U.S. at 74, n.12 (since "the ALJ, Board, and Court

of Appeals have unanimously concluded that the longshoremen's employers, marine shipping companies, have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers," the *Pipefitters* [right to control] test is satisfied here."); see also, *ILWU (California Cartage),* 278 NLRB at 223, ("The containers are owned or leased by the steamship companies [who therefore] control the use of the containers…. [even though they] typically provide for the initial loading and unloading of the containers by contracting with container freight stations for the performance of this work."), *aff'd,* 822 F.3d at 1210-11; and, *ILA,* 266 NLRB at 261 ("the contractual assignment to the ILA operates as a prior restraint upon shippers, importers, or their agents who would choose to utilize containers owned or leased by steamship companies" contrary to the ILA labor agreement.)

In sum, the Panel and underlying Board Decisions directly conflict with the authorities discussed above, necessitating the Circuit's *en banc* rehearing.

Respectfully submitted,

Dated: December 20, 2017        LAW OFFICE OF ROBERT REMAR

By:     /s/ Robert S. Remar
Robert Remar
Law Office of Robert Remar
1188 Franklin St 4th Floor
San Francisco, CA 94109
Tel: (510) 499-1570
rremar@remarlaw.com

Dated: December 20, 2017  LEONARD CARDER, LLP

        By: /s/ Emily M. Maglio
          Emily M. Maglio
          Leonard Carder, LLP
          1188 Franklin St Suite 201
          San Francisco, CA 94109
          Tel: (415) 771-6400
          Fax: (415) 771-7010
          emaglio@leonardcarder.com

          *Attorneys for Petitioners,*
          INTERNATIONAL LONGSHORE
          AND WAREHOUSE UNION *and*
          ILWU LOCAL 8 AND ILWU LOCAL 40

**CERTIFICATE OF COMPLIANCE**

ILWU's Petition for *En Banc* Rehearing complies with Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i), governing length of such brief, because it contains 3,892 words, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010, font Times New Roman, and font size 14.

Dated: December 20, 2017          LAW OFFICE OF ROBERT REMAR

                                   By:    /s/ Robert S. Remar
                                          Robert Remar

                                          *Attorneys for Petitioners,*
                                          ILWU *and* ILWU LOCAL 8 AND 40

## ADDENDA TO PETITION

1.    Copy of Panel's Judgment (D.C. Cir. November 6, 2017)


2.    Copy of Board Decision, ILWU (ICTSI), 363 NLRB No. 12 (September 24, 2015)


3.    Certificate as to Parties, Rulings and Related Cases


4.    Corporate Disclosure Statement

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 15-1344                       **September Term, 2017**

FILED ON: NOVEMBER 6, 2017

INTERNATIONAL LONGSHORE & WAREHOUSE UNION, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

ICTSI OREGON, INC.,
INTERVENOR

Consolidated with 15-1428

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

## J U D G M E N T

These cases were considered on the record from the National Labor Relations Board and the briefs and arguments of the parties. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). It is

**ORDERED AND ADJUDGED** that the petition for review be denied and the cross-application for enforcement be granted for the reasons stated below.

The International Longshore & Warehouse Labor Union et al. ("ILWU") petition for review of the National Labor Relations Board's ("NLRB," or the "Board") decisions (1) affirming the Administrative Law Judge's ("ALJ") determination that ILWU lacked a lawful work preservation objective, (2) affirming the ALJ's denial of ILWU's motion to reopen the record to consider new evidence, (3) denying ILWU's motion to take administrative notice of the transcript and evidence from the second case on this issue, (4) denying ILWU's motion to

consolidate this case with the second case on this issue, and (5) denying ILWU's motion to supplement its exceptions to argue that the Board's Acting General Counsel lacked authority to issue the underlying complaint because he was unconstitutionally appointed.  The NLRB cross-applies for enforcement of its decision and order.

Our review of unfair labor practice determinations by the Board is "quite narrow." *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000).  We set aside orders of the NLRB only if the Board lacks a reasonable basis in law, fails to apply the proper legal standard, departs from precedent without reasoned justification, or its factual determinations lack substantial evidence.  *See Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445-46 (D.C. Cir. 2004); *see also Sutter E. Bay Hosps. v. NLRB*, 687 F.3d 424, 437 (D.C. Cir. 2012).  Under this standard, the Board's findings are "conclusive" if supported by substantial evidence on the record as a whole.  29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

A lawful work preservation objective must target a signatory employer that has the power to give the work to the employees, the "right of control" test.  *NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO*, 447 U.S. 490, 504 (1980).  ILWU argues that the Board committed legal error because the shipping carriers own their refrigerated shipping containers ("reefers"), and by virtue of that ownership, they have the ultimate right of control as to who handles the reefers.  *Cf. id.* at 512 n.27.  The ALJ rejected this claim, reasoning that "[t]hough it is true that the carriers own or lease all of the reefers, they purchase available terminal services necessary to load, unload and store their containers from the terminal owners or operators."  The ALJ relied on evidence that "when the Port [of Portland] leased [the Terminal 6] container operation to ICTSI, it carefully reserved the historical practices that developed over the years with respect to the work performed by [IBEW]" and "[n]o evidence shows that the Port ever relinquished its control at any time to anyone . . . to perform the dockside reefer work."  The Board affirmed the ALJ's analysis that the Port of Portland ("Port") was the primary employer because it retained the right to control the assignment of the dockside reefer work.  Therefore, ILWU labor practices targeted against ICTSI, the shipping carriers, or any other neutral party to pressure the Port to re-assign the dockside reefer work were unlawful secondary boycotts targeting an employer that did not have the right to control the work.  Because the Board's conclusion applied the proper legal standard and its factual findings regarding the Port's right of control over the reefer work are supported by substantial evidence, we need not opine on whether the contested dockside reefer work was fairly claimable by ILWU.  Therefore, we deny ILWU's petition with respect to this issue.

The petitioners' remaining arguments for review seek to have us redetermine factual questions and the conclusive determination made by the Board.  Upon review of the record and the arguments of counsel, we conclude that the Board's decisions survive the standard of review and that the Board did not abuse its discretion with respect to its rulings on ILWU's motions.  Furthermore, the Board's conclusions of law are all reasonable and must be upheld.  *See Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984).

2

For these reasons, the ILWU's petition is denied and the Board's cross-application for enforcement is granted.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc.  *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Ken Meadows
Deputy Clerk

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**International Longshore and Warehouse Union, AFL–CIO, and International Longshore and Warehouse Union, Local 8, AFL–CIO, and International Longshore and Warehouse Union, Local 40, AFL–CIO, *and* ICTSI, Inc.**

**International Longshore and Warehouse Union, AFL–CIO, and International Longshore and Warehouse Union, Local 8, AFL–CIO, and International Longshore and Warehouse Union, Local 40, AFL–CIO, *and* Port of Portland.** Cases 19–CC–082533, 19–CD–082461, 19–CC–087504, 19–CD–087505, and 19–CC–082744

September 24, 2015

DECISION AND ORDER

By Chairman Pearce and Members Hirozawa and McFerran

On August 28, 2013, Administrative Law Judge William L. Schmidt issued the attached decision. The Respondents filed exceptions and a supporting brief. The General Counsel, Charging Party ICTSI, Inc., and Charging Party Port of Portland filed answering briefs. The Respondents filed a reply brief.[1]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.[2]

The Board has considered the decision and record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[3] and conclusions and to adopt the recommended Order as modified.[4]

---

[1] In addition, pursuant to *Reliant Energy*, 339 NLRB 66 (2003), the Respondents filed two postbrief letters calling the Board's attention to recent case authority.

By Order dated September 12, 2014, the Office of Executive Secretary denied the Respondents' motion to consolidate this case with another case (19–CC–100903 et al.), which involves similar allegations against the Respondents for engaging in job actions against ICTSI.

[2] Member Miscimarra is recused and took no part in the consideration of this case.

[3] We adopt the judge's finding that the Respondents violated Sec. 8(b)(4)(i) and (ii)(B) of the Act by engaging in a series of job actions against ICTSI Oregon, Inc. (ICTSI), and the steamship carriers that call on Terminal 6 (T6) of the Port of Portland (Port) with an unlawful "cease doing business" object, namely seeking the Port's relinquishment of control over the dockside reefer work at T6 for the benefit of the workers represented by Respondent ILWU Local 8. In affirming the judge's 8(b)(4)(B) findings, we do not rely on his references to the Board's 10(k) decision in this dispute, *Electrical Workers Local 48 (ICTSI Oregon, Inc.)*, 358 NLRB No. 102 (2012).

The judge also found that the Respondents violated Sec. 8(b)(4)(D) by filing, maintaining, and prosecuting grievances or lawsuits against ICTSI and the steamship carriers, in order to force the Port to assign the

AMENDED CONCLUSIONS OF LAW

1. Delete Conclusion of Law 8.

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified below and orders that the Respondents, International Longshore and Warehouse Union, AFL–CIO, San Francisco, California, International Longshore and Warehouse Union, Local 8, AFL–CIO, Portland, Oregon, and International Longshore and Warehouse Union, Local 40, AFL–CIO, Portland, Oregon, their officers, agents, and representatives, shall take the action set forth in the Order as modified.

1. Delete paragraphs 1(e) and 2(a) and renumber the subsequent paragraphs accordingly.

2. Substitute the attached notice for that of the administrative law judge.

Dated, Washington, D.C.   September 24, 2015

---

Mark Gaston Pearce,                    Chairman

---

dockside reefer work at T6 to employees represented by Respondent ILWU Local 8, after the Board issued the 10(k) decision, supra, awarding that work to employees represented by another union. On June 17, 2013, however, the Federal District Court for the District of Oregon vacated the Board's 10(k) decision on the ground that the Board lacked statutory jurisdiction to award the work to the Port's electricians because, as public-sector employees, they are not employees within the meaning of Sec. 2(2) of the Act. *Pacific Maritime Association* v. *NLRB*, Case No. 3:12–CV–02179–MO (D.Or.) (unpublished decision). By Order dated February 20, 2014, the Board granted the General Counsel's motion to sever, hold in abeyance, and postpone briefing on the Sec. 8(b)(4)(D) allegations in this case. In light of that Order, we do not address the Respondents' exceptions to the judge's 8(b)(4)(D) findings at this time.

We find no merit in the Respondents' exception to the judge's denial of the Respondents' motion to reopen the record to admit and consider certain "new evidence and law." The Respondents' motion describes the evidence as having been "created . . . months after the close of the hearing on August 29, 2012." Accordingly, we agree with the judge that the evidence does not meet the Board's standard for "newly discovered evidence" under Sec. 102.48(d)(1) of the Board's Rules and Regulations. See *Allis-Chalmers Corp.*, 286 NLRB 219, 219 fn. 1 (1987) (evidence not "newly discovered" if it came into existence following the close of the hearing). For the same reason, we deny the Respondents' motion requesting that the Board take administrative notice of that evidence. We also deny the Respondents' motion to take administrative notice of a brief filed by the General Counsel in *California Cartage Co.* v. *NLRB*, 822 F.2d 1203 (D.C. Cir. 1987), and ICTSI's motion to take administrative notice of the General Counsel's exceptions and briefs in *International Longshore and Warehouse Union (Kinder Morgan Bulk Terminals)*, 19–CC–092816.

[4] We shall amend the judge's conclusions of law and modify the judge's recommended Order to conform to the violations found. In addition, we shall substitute a new notice to conform to the Order as modified and in accordance with our decision in *Durham School Services*, 360 NLRB No. 85 (2014).

2                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

_____

Kent Y. Hirozawa,                Member

_____

Lauren McFerran,                 Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT induce or encourage employees of ICTSI Oregon, Inc. (ICTSI) to withhold their services, engage in slowdowns and work stoppages, or interfere with the lawful and proper work assignments of other employee groups that perform services at Terminal 6 in Portland, Oregon, in order to force or require ICTSI, or any sea-going carrier, to cease using the services provided at Terminal 6.

WE WILL NOT directly or indirectly threaten in any manner to shut down or otherwise disrupt ICTSI's operations at Terminal 6, Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port of Portland at Terminal 6.

WE WILL NOT fail and/or refuse to fulfill ICTSI's timely requests for the referral of qualified employees for work at Terminal 6 in accord with the Pacific Coast Longshore and Clerks Agreement in order to force or require ICTSI or any other person to cease doing business with the Port at Terminal 6.

WE WILL NOT file, process, maintain, and/or prosecute grievances or lawsuits, or threaten to engage in such conduct against ICTSI, Terminal Maintenance Corporation (TMC), COSCO North America, Inc., Hanjin Shipping America, LLC, **"X"** Line America, Inc., Hamburg Sud North America, Inc., and Hapag Lloyd America Inc.,

or any other similarly situated neutral employer at Terminal 6, in order to force or require any of them or any other neutral employers or persons to cease doing business with the Port of Portland.

WE WILL NOT in any like or related manner induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in a strike or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to force or require any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person.

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, AFL–CIO

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 8, AFL–CIO

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 40, AFL–CIO

The Board's decision can be found at www.nlrb.gov/case/19-CC-082533 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



*Mara-Louise Anzalone, Lisa J. Dunn,* and *Rachael Harvey, Attys.,* for the Acting General Counsel.
*Michael T. Garone, Atty. (Schwabe, Williamson & Wyatt),* of Portland, Oregon, for ICTSI, Inc.
*Kathy A. Peck, Atty. (Williams, Zografos & Peck),* of Lake Oswego, Oregon, *Randolph C. Foster* and *Daniel G Muller, Attys. (Stoel, Rives LLP),* of Portland, Oregon, for the *Port of Portland.*
*Norman Malbin, Atty.,* of Portland, Oregon, for IBEW Local 48.

Robert Remar and Eleanor Morton, Attys. (Leonard Carder, LLP), of San Francisco, California, for ILWU Locals 8 and 40.

Kirsten Donovan, ILWU Director of Contract Administration, of San Francisco, California, for the ILWU.

## DECISION

### STATEMENT OF THE CASE

WILLIAM L. SCHMIDT, Administrative Law Judge. I heard this case in Portland, Oregon, over the course of 12 days between July 31 and August 29, 2012.[1] This proceeding seeks to resolve the legality under Section 8(b)(4)(i), (ii)(B), and (D) of the National Labor Relations Act (the Act or NLRA) of several job actions the International Longshore and Warehouse Union, AFL–CIO (ILWU), and its Locals 8 and 40 undertook to compel the reassignment of work historically performed by workers represented by Local 48 of the International Brotherhood of Electrical Workers, AFL–CIO (Local 48) at Terminal 6 (T6), one of the marine terminals owned by the Port of Portland (the Port), a municipal subdivision of the State of Oregon, after the Port leased that facility to ICTSI Oregon, Inc. (ICTSI or Company).[2]

This proceeding is intertwined with the unfair labor practice charge in Case 19–CD–080738 filed by ICTSI against Local 48 on May 10. In that case, the Regional Director for Region 19 of the National Labor Relations Board (NLRB or the Board) issued a notice of hearing pursuant to Section 10(k) on May 17.[3] His 10(k) hearing notice described the work in dispute

(the dockside reefer work)—applicable both here and there—as follows:

> Plugging, unplugging, and monitoring of refrigerated cargo containers for ICTSI, Inc., at Terminal 6 of the Port of Portland, Portland, Oregon.

ILWU Local 8 intervened and participated in the 4-day 10(k) hearing that commenced on May 24. On August 13, during a recess in this proceeding, the Board issued its 10(k) decision and determination in Case 19CD080738 awarding the disputed work to the Port's public employees represented by Local 48. Electrical Workers Local 48 (ICTSI Oregon, Inc.), 358 NLRB No. 102 (2012) (the 10(k) case). The Board's decision also affirmed the hearing officer's denial of a motion to intervene in that proceeding by the Pacific Maritime Association (PMA).

After this hearing closed, the PMA commenced a Leedom v. Kyne action in the Federal District Court for the District of Oregon challenging the Board's authority 10(k) case to award the dockside reefer work to workers who, by definition, are not employees under the NLRA, namely the electricians represented by Local 48 who work for the Port, a public institution. On June 17, 2013, the court vacated the Board's decision and determination in the 10(k) case on the ground that the Board lacked statutory jurisdiction to award the dockside reefer work at T6 to the Port's electricians under Section 8(b)(4)(D) of the Act because they are not employees within the meaning of Section 2(2).

Following the district court's decision, Respondent ILWU filed a motion with me to reopen the record in order to receive further documentary evidence. I provided all other parties an opportunity to respond. Following receipt of their responses, I took official notice of the court's June 17 order, notified the parties I would also take official notice of any Board decision about appealing the court's order, denied Respondents' motion in all other respects, and submitted Respondents' documents attached to its motion to reopen to the rejected exhibit file.

I now take official notice of the information provided to all parties that the Board's decision to appeal the court's order vacating the 10(k) award is still pending. In the absence of a definitive decision by the Board to accept the district court's decision as the law of the case, I deem myself obligated to apply the Board's decision in the 10(k) case for purposes of this administrative adjudication. See Iowa Beef Packers, 144 NLRB 615 (1963), and the cases cited at fns. 1 and 2.

On June 5, ICTSI also filed Case 19–CD–082461 against ILWU, and Locals 8 and 40 that made the same claims and involved the same disputants that earlier participated in the 10(k) case. For that reason, the Regional Director held this charge in abeyance.

ICTSI filed Case 19–CC–082533 against the ILWU and Locals 8 and 40 on June 6. The Port followed on June 8 by filing Case 19–CC–082744 against the same labor organizations. The Regional Director consolidated these two charges and is-

---

[1] Unless shown otherwise, all further dates refer to the 2012 calendar year.

[2] In Sec. 8(b)(4) Congress declared that it is an unfair labor practice for a labor organization to "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," where in either case the object is "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of Section 9" or "(D) forcing or requiring any employer to assign work to employees in a particular union, trade, craft or class rather than to employees in another union, trade, craft, or class, unless the employer is failing to conform to a Board order or certification determining the representative of the employees performing the disputed work."

[3] When reasonable cause exists to believe that a labor organization has violated Sec. 8(b)(4)(D) as alleged in a timely filed charge, Sec. 10(k) requires the Board to hear and determine the dispute out of which that unfair labor practice arose unless the parties submit satisfactory evidence within 10 days after being provided notice that a charge has been filed that they have adjusted, or have agreed upon a method for voluntarily adjusting the dispute. See NLRB v Radio & Television Broadcast Engineers Local 1212 (Columbia Broadcasting System), 364 U.S. 573 (1961). If the parties comply with a work assignment deter-

mination made in a 10(k) proceeding, or their own adjustment means, Sec. 10(k) provides for the voluntary dismissal of the 8(b)(4)(D) charge. Here, the 10(k) hearing went forward on May 24 because no voluntary means of adjusting this dispute had been advanced.

sued a consolidated complaint and notice of hearing on June 24 alleging that the ILWU and Locals 8 and 40 violated Section 8(b)(4)(i) and (ii)(B) (the June complaint).

During this hearing, counsel for the Acting General Counsel (AGC) moved to amend the June complaint twice. I granted both motions. The first amendment on July 24 substituted revised substantive allegations in place of those set forth in paragraph 6(v) and added paragraph 6(y) to the June complaint. The second amendment to the June complaint dated August 20 (after the Board's award in the *10(k) case*) consolidated Case 19–CD–082461, earlier held in abeyance by the Regional Director, with the other charges in the June complaint.

The August 20 amendment also made numerous changes to the substantive allegations in the June complaint. Apart from the addition of new allegations based on Case 19–CD–082461, this amendment modified the several allegations originally made in the June 20 complaint.[4] Specifically, it modified the allegations in the following subparagraphs of the June complaint: 4(b), 6(b). (c), (f), (g), (i), (j), (k), (l), (m), (n), (o), (p), (v), and (w), and 12, and the prayer for relief. It also added the following subparagraphs (shown in the August 20 amendment document only): 5(d), 6(aa), (bb), (cc), and 11(b) and (c). Finally, it withdrew the allegations contained in subparagraphs 6(d) and (q) of the June complaint. Together, the July 24 and August 20 amendments to the June complaint resulted in an overall allegation that the Respondents had engaged in conduct that violated Section 8(b)(4)(i), (ii)(B), and (D).

On August 17, following the Board's 10(k) award in Case 19–CD–080738, ICTSI filed Cases 19–CC–087504 and 19–CD–087505 against the ILWU, and Locals 8 and 40. After ITCSI amended both charges on August 22, the Regional Director consolidated the two cases and issued another consolidated complaint on August 23 (the August complaint) that also alleged that the ILWU along with its Locals 8 and 40 violated Section 8(b)(4)(i), (ii)(B), and (D).

On the entire record,[5] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the AGC, ICTSI, the Port, the ILWU and its Locals 8 and 40, I make the following

### FINDINGS OF FACT

#### I. JURISDICTION AND LABOR ORGANIZATION STATUS

Respondents admit and I find that the Company, an Oregon corporation, with an office and place of business located at T6, is engaged in the business of operating a cargo handling facility. During the 12-month period prior to June 15, 2012, a representative period, ICTSI, in the conduct of its business at T6, purchased goods and supplies valued in excess of $50,000 directly from entities located outside the State of Oregon. Respondents further admit, and I find, that ICTSI has been, at all material times, an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

Respondents also admit that they are each labor organizations within the meaning of Section 2(5) of the Act. In addition, in the *10(k)* case, the Board found that IBEW Local 48 is also a labor organization within the meaning of Section 2(5) of the Act.

#### II. ALLEGED UNFAIR LABOR PRACTICES

##### A. Introduction

This highly complex and very technical labor dispute has arisen over the performance of a relatively simple work task. For nearly four decades well-trained, highly-skilled tradesmen who are represented by an IBEW local union have performed the dockside reefer work at T6. The work calls upon little, if any, of the technical craft skills traditionally acquired by these tradesmen through their rigorous apprenticeship program or their subsequent job experience performing tasks that would be very dangerous for untrained workers. Yet this particular work task takes place smack in the middle of a complex stevedoring operation traditionally performed by longshore workers and marine clerks represented by ILWU local unions, an industrial labor organization concerned with technological advances that imperil the livelihood of their members.

On the surface, the decisionmaking underlying this division of labor at T6 could not appear to be more ill-conceived. Terminal Manager Jim Mullen, the onsite ICTSI management official affected most by this dispute agreed that this specific work arrangement, which was confirmed by the NLRB in the middle of this proceeding, is not an efficient arrangement. Even though his personal assessment is clearly contrary to his employer's interest, the detailed facts described below suggest that his professional viewpoint is an understatement.

Each of the labor organizations competing for the work, ILWU Local 8 and IBEW Local 48, assert a contractual basis for performing the dockside reefer work, claiming that it amounts to the kind of "maintenance" or "maintenance and repair" work covered by the collective-bargaining agreements under which they operate. As detailed below, the contractual language on which the competing parties rely is vague and ambiguous. Instead, the applicable collective-bargaining agreements make only broad references to maintenance work and the parties arguments over their right to perform this work fan out from that generic source.

Local 48's claims rest primarily on the fact that the workers it represents have performed the disputed work at T6 undisturbed for nearly four decades before the time this dispute arose. Local 8's claim is grounded essentially on internal interpretations in recent years of provisions in the coastwise PMA/ILWU collective-bargaining agreement applicable to West Coast ports which recognize the dockside reefer work as traditional stevedoring work that must be performed by longshore workers with specific exceptions at several ports other than Portland.

For reasons detailed below, a preponderance of the evidence supports a conclusion that, when the Port leased its T6 container facility to ICTSI in May 2010, it reserved the right to perform certain work itself, including, among other tasks, the dockside reefer work in accord with the lengthy historical practice at that terminal. Some of these tasks are specifically

---

[4] By that time, the hearing testimony provided counsel for the AGC with sufficient "discovery" about the identity of the Respondent's agents previously alleged as "unknown agents" in the June complaint.
[5] I took official notice of the hearing record in the *10(k)* case, and have considered evidence from that record in making my findings here.

spelled out in the Port's lease with ICTSI but others are de-scribed in terms of the work historically performed under the collective-bargaining agreement between the Port and Local 48. From the outset, both the Port and ICTSI construed their lease to include the dockside reefer work within the responsibilities retained by the Port.  Even though the evidence shows that Local 8 made a demand for the dockside reefer work at the time that ITCSI actually took over container operations at T6 in 2011, ITCSI promptly rejected that demand citing specific lease terms.  Yet, another year passed on top of the previous four decades before Local 8, Local 40, and the ILWU initiated vari-ous actions to directly pressure numerous entities other than the Port in an effort to secure the assignment of the tasks involved to the workers represented by Local 8.

### B. The Setting and the Involved Entities

As noted, the Port of Portland is a political subdivision of the State of Oregon.  It is governed by the Port Commission whose members are appointed by the Governor of Oregon.  The Port owns T6, a large marine terminal on the Columbia River at Portland, some 100 nautical miles inland from the Pacific Ocean.  Terminal 6, situated on a 400-plus acre site, is primari-ly a container terminal designed and equipped to load and un-load seagoing container vessels, and to park incoming and out-going cargo containers while awaiting shipment by land or sea.  Some smaller segments of T6 also serve as a terminal for im-ported autos and for break-bulk goods but this matter concerns only the container operation.  The Port owns and operates three other nearby marine terminals on the Willamette River, but none of these other terminals handle containerized cargo nor are any of these other terminals involved in this proceeding.[6]  In addition to its marine terminals, the Port also owns and oper-ates Portland International Airport.

The Port commenced container operations at T6 in 1974.  Between 1974 and 1993, the Port itself operated all aspects of the terminal, directly employing all of the workers there.  The longshore employees worked under the terms of a local collec-tive-bargaining agreement described in detail below.  From 1993 until February 2011, the Port continued to operate T6 but retained a stevedoring contractor, Marine Terminals Corpora-tion and its successor, Ports America (MTC/PA), on a cost-plus basis to manage the T6 stevedoring operations.  Unlike the Port, MTC/PA held membership in the PMA throughout its tenure at T6.[7]

However, the Port continued to directly employ other work-ers to maintain the physical facilities and equipment it owned at T6 as well as at other Port-owned terminals.  These other work-ers included the Local 48-represented electricians and others in the skilled trades pursuant to a collective-bargaining agreement with the District Council of Trade Unions (DCTU), an umbrella labor organization in Portland comprised of several different

craft unions plus a municipal workers union.  Throughout this period, the Port also employed administrative and professional personnel to market its terminal services and to manage its agreements with the carriers (the steamship lines) using the Port's terminal services to process their cargo.

MTC/PA, which continues to conduct operations at other United States marine terminals, employed the longshore and marine clerk labor at T6 pursuant to the terms of the PMA's coastwise collective-bargaining agreement with the ILWU.  Insofar as is known, MTC/PA never had a collective-bargaining agreement with any of the craft unions that represent nonstevedore workers in and around T6 or the other Port termi-nals.

The PMA, a San Francisco-based multiemployer bargaining agency, negotiates and administers on behalf of its employer members a coastwise maritime labor agreement with the ILWU.  Its membership includes domestic carriers, internation-al carriers, and stevedores that operate in California, Oregon, and Washington.  PMA policy is established and controlled by an 11-member board of directors.  The 2011 PMA annual re-port shows that seven members of the board were officials of international carriers, two were officials of domestic carriers, and two were officials of stevedoring companies, similar to ICTSI, with no carrier operations.

The principal agreement between the PMA and the ILWU is known as the Pacific Coast Longshore and Clerks Agreement (PCL&CA).  This coastwise agreement applies to all PMA members engaged in operations at West Coast marine terminals from San Diego, California, to Bellingham, Washington.  The PCL&CA consists of two documents: (1) the Pacific Coast Clerks Contract Document (PCCCD) governing the marine clerks' terms and conditions of employment, and (2) the Pacific Coast Longshore Contract Document (PCLCD) governing the longshore workers' terms and conditions of employment.  The term of the current PCL&CA runs from July 1, 2008, until July 1, 2014.  This dispute deals almost exclusively with the PCLCD.

By 2006, the Port remained the only public authority directly operating a marine terminal in the United States.  The wide-spread industry trend toward privatization lead Port executives to initiate an internal review of the business model then in use for the operation of T6 with the belief that further privatization at Portland could lead to greater use of its facilities, one of the smaller container terminals on the West Coast.  Eventually, the Port began to consider the complete privatization of the T6 container operation using a "concession agreement" model used at other ports.  This model provided for a long-term lease ar-rangement with a private stevedore that involves a large upfront payment followed by smaller annual payments.

In the early part of 2007, the Port solicited a Request for Qualifications (RFQ) throughout the industry from those deemed qualified to operate T6.  The initial RFQ contemplated a 75-year lease arrangement.  In September 2008, the Port pre-pared and made available to the prospective concessionaires a draft lease agreement.  Importantly, that draft also contained provisions requiring any potential lessee to honor the historical division of labor maintained by the Port at T6, a requirement that is at the core of this dispute.  Between that time and No-

---

[6]  Portland is situated at the confluence of the Columbia and Willamette Rivers.

[7]  Because the PMA provides its member companies with payroll services, the Port ceased to have a "payroll relationship" with the Local 8 longshore workers and the Local 40 marine clerks when it engaged MTC/PA as the stevedoring contractor.  Instead, these workers received their weekly payroll checks from the PMA.

vember 2008, the Port received proposals from a dozen pro-spective terminal operators, including ICTSI's Manila-based parent. However, the near collapse of the global shipping mar-ket that year caused the Port to temporarily abandon this initia-tive in November.

Port officials notified each of its RFQ respondents about its decision to put the project on hold. During a conference call to inform ICTSI officials of the Port's decision, that company's executives urged Port executives to consider an alternate ar-rangement that involved a much shorter lease term and a small-er upfront payment. This suggestion led to further telephone exchanges followed by a bilateral meeting between Port execu-tives and ICTSI officials in March 2009. Following this initial meeting, the Port and ICTSI continued negotiate for the next 13 months over the terms of a T6 lease before reaching an agree-ment.

In early May, officials of ICTSI's parent hired Elvis Ganda, an experienced West Coast marine terminal executive as the chief executive officer of ICTSI, the subsidiary it established to operate T6 under the soon-to-be-concluded lease. Ganda then retained James Mullen, an experienced manager in the industry, as the T6 terminal manager, and Brian Yockey as the T6 ma-rine manager responsible for terminal's vessel operations.

On May 12, 2010, the Port Commission approved a 25-year lease of T6 to ICTSI. The complex lease terms provided for a closing date in 90 days plus a transition period while ICTSI completed preparations for taking over the T6 container opera-tion. It also provided for the Port to assign all of its carrier agreements with various container ship owners to ICTSI and for the sale of a large amount of the equipment the Port owned in connection with its T6 operations.

The lease contained two provisions discussed in more detail below designed to retain the historical work jurisdiction of the craft workers long employed by the Port under its collective-bargaining agreement with the DCTU. The lease also required ICTSI to reimburse the Port for the services performed by the Port's employees at T6, including the disputed dockside reefer work involved here.

In preparation for operating T6, ICTSI entered into a "ser-vice/use" agreement with the Terminal Maintenance Corpora-tion (TMC) so the latter could continue to carry on its business on the premises at the terminal. TMC, under agreements with the various carriers that use T6 services, performs repair, maintenance, and cleaning work on the carrier-owned or leased equipment, including repairs to container chassis, refrigerated containers (reefers), nonrefrigerated containers (cans), and diesel generators (gensets) that provide electrical power to op-erate the reefers while in transit over land. None of the work performed by TMC is in dispute. TMC employs mechanics represented by Local 8. Dave Echels manages the TMC opera-tion; Preston Foster oversees the work of the Local 8-represented employees.

ICTSI joined the PMA in or about June 2010, after the lease was signed and approved but well in advance of commencing its T6 operations on February 12, 2011.

### C. The Disputed Dockside Reefer Work at T6

To preserve their contents, certain commodities passing through a marine terminal must be shipped in refrigerated con-tainers. The carriers own or rent all of the containers, including the reefers. The determination as to whether a commodity must be transported in a reefer is one made between the shipper and the carrier.

When a reefer is required, the shipping documents will in-clude the specified temperature and ventilation settings. After the shipping documents are complete, the carrier books the reefer into the terminal. The booking process shows the ex-pected arrival date of the reefer at the terminal as well as other details necessary for terminal personnel to receive and handle the reefer until it is loaded on the carrier's ship for transport to another marine terminal for offloading. The temperature and ventilation settings specified in the shipping documents must be maintained throughout the reefer's transit.

Reefers arrive at T6 by truck, train, or barge. From the per-spective the longshore workers, marine clerks, and electricians at T6, the process is essentially the same regardless of the means used to transport a reefer to, or away from, the terminal. In transit to the terminal, the refrigeration unit is operated by the genset. Once at the terminal, the genset is removed and the reefer is plugged into a permanent electrical outlet on the ter-minal grounds. Since 1974, or going back through all the time the Port operated T6 directly and with the aid of its contract stevedore MTC/PA, the Port-employed electricians performed the work of plugging and unplugging the reefers as well as regularly monitoring the reefers to insure that the proper tem-perature and ventilation levels were maintained throughout its stay at T6. However, when reefers arrived at the terminal on a container ship or were loaded onto a ship for transport, long-shore workers represented by Local 8 boarded the ship and performed the plugging and unplugging work. Hence, one employee group (Local 48 electricians) has historically per-formed the dockside reefer work while the other group (Local 8 longshore workers) performed the identical work aboard ships berthed at T6.

When a truck carrying a "live" (refrigerated) export load en-ters the terminal gate, it first goes through a mechanized securi-ty scan. The driver then moves the vehicle on to the scales for a weight check. While at the scales, the driver initiates contact with one of ICTSI's marine clerks represented by Local 40. During this gate transaction, the driver provides information concerning the load and the marine clerk designates a "yard spot" where the reefer will ultimately be unloaded or "decked."[8] The clerk then instructs the driver to pull up to the reefer check-in area (reefer blocks) a short distance beyond the scales to await an initial inspection by a Port-employed electri-cian.

Meanwhile, the marine clerk also notifies a Port-employed electrician about the arrival of a reefer and provides the electri-cian with relevant information that includes the reefer number, its specified temperature and ventilation settings, and other

---

[8]  A large portion of the T6 acreage consists is devoted to the "con-tainer yard," essentially a parking lot for containers divided into sec-tions and spots where the containers are stacked.

relevant data including the reefers' section and slot assignment.[9]  After receiving this report, a Port electrician assigned to be "on the gate" that day proceeds to the reefer check-in area to verify and record the arrival temperature and ventilation settings shown on the reefer's gauges.  If the settings conform to the information provided by the marine clerk, the electrician instructs the driver to proceed to its assigned spot in the container yard and follows the truckdriver to that location in his own vehicle.

If, upon the initial inspection at the reefer blocks, the electrician finds the reefer's temperature and ventilation settings are outside the carrier's specifications, this condition is immediately reported to a marine clerk.  The clerk, in turn, informs a carrier representative and requests instructions as to whether to accept a "bad load."  On occasion, the carrier might request TMC, the carriers' equipment maintenance subcontractor at the site, to have a mechanic inspect and correct the problem if possible.  If the TMC mechanic quickly succeeds, the reefer might be accepted; if not, the carrier might direct the marine clerk to reject the reefer for shipment.  Regardless, the carrier makes all decisions about the handling of questionable loads.  Estimates as to how frequently a bad load arrives ranged from once a week to once every 3 weeks.

Absent any problem, a TMC mechanic (also provided notice about the arrival of a reefer) meets the truckdriver at the designated container location, removes the genset (also owned by the carrier) and takes it to the TMC shop at the terminal.  When that is complete, a Local 8-represented operator employed by ICTSI "decks" the reefer, i.e., removes the reefer from the truck chassis utilizing a machine called a "reach stacker" and puts the reefer into the designated spot at the container yard, which might involve stacking the reefer on top of one or more reefers already decked in that designated spot.  After the reefer has been decked, the Local 48-represented Port electrician then plugs the reefer into a receptacle on a nearby reefer electrical bank, checks briefly for the proper operation of the container's refrigeration unit, and enters the reefer into a monitoring log maintained by the Port electricians.

Typically, a reefer will remain in the container yard a few days awaiting shipment.  During that time, Port electricians monitor the reefers twice daily to insure that the temperature and ventilation settings have remained at the specified level.  The monitoring process requires a visual inspection of each reefer and recording the readings reflected on the reefer's gages in the monitoring log.[10]  Although it varies by season, usually there are about 60 reefers at T6 awaiting shipment at any given time.

### D. The Relevant Labor Relations History at T6

Over the years, the Port has employed various craft workers at T6, including electricians represented by Local 48, pursuant

to its agreement with the DCTU.[11]  The relevant portion of the scope of the work provision contained in the most recent DcTU agreement, effective from July 1, 2009, through June 30, 2012, provides as follows:

> This Agreement shall cover all construction, demolition, installation, and maintenance assignments which have been historically and consistently performed by employees covered under this Agreement, and such work assignments will continue under this Agreement at all marine cargo handling facilities owned and operated by the Port, including any marine cargo handling facilities leased and operated by the Port.
> . . . .
> The scope of this Agreement shall include any marine cargo handling facilities leased by the Port to an independent operator or to the extent the Port retains the responsibility for the maintenance or repair of any such leased facility or facilities. In the event the Port leases any existing facilities that are covered under this Agreement to an independent operator, and such operator is responsible for maintenance of such facility, the jurisdiction of the respective crafts shall be maintained in respect to any personnel employed by such operator to perform work covered by the scope of this Agreement and such employees performing such work shall receive not less than the terms and conditions of this Agreement.

Presumably, Port officials concluded at some time that this nebulous scope of work provision or it predecessor, applicable to all of the workers in all of the trades employed by the Port under the DcTU agreement, included the specific tasks of plugging, unplugging, and monitoring reefers decked at T6 and assigned that work to the electricians covered by the DCTU agreement.  No one provided the underlying rationale for this anomalous assignment decision obviously made long ago but ICTSI continued the practice of using the Port's electricians to perform the disputed reefer work rationalizing that the lease required it to honor the historical work jurisdiction of those workers whose terms and conditions of employment were provided for under the Port/DCTU agreement.

Unquestionably, the Local 48-represented electricians have many other responsibilities in connection with their facility maintenance responsibilities.  Quite unlike the reefer work, these other responsibilities appear to require the knowledge, training, and skills ordinarily associated with tradesmen who work in that craft.  A March 2010 position description for a Port "Marine Electrician" summarizes the work functions of a Port electrician.  The functions shown in the job description document include an estimate of the amount of time a Port electrician might expect to spend performing a particular task along with a summary description of the separate tasks listed in order of their importance.  It shows the following:

---

[9]  A system also exists for the Port electricians' office to receive an automatic email that provides the same information.

[10]  It is unclear whether the Local 8 longshore workers or the ship's own personnel performs this monitoring work after the reefer is loaded aboard ship and while it remains berthed at T6.

[11]  Along with Local 48, the other constituent members of the DCTU based on the labor organizations signatory to the most recent collective-bargaining agreement with the Port are: Pacific Northwest Regional Council of Carpenters; Plumbers Local 290; Municipal Employees Local 483; Painters District Council, Local 55; Operating Engineers Local 701; and Boilermakers Local 500.  None of these other unions figure directly in this dispute.

8                           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(50%) 1. Perform maintenance of electrical control systems on Port container cranes; the ability to troubleshoot and repair large DC motors and DC motor controls; Trouble-shoot electrical and electronic controls, including relay logic, Programmable Logic Controller (PLC) programming and trouble shooting, and radio and/or micro-wave controls.  Perform maintenance of electrical distribution systems from voltages that range from 120 to 12.5KV volt branch circuits.

(30%) 2. Repair and/or replace any and all electrical systems at Marine facilities.

(10%) 3. Install and start-up new equipment, associated feeders, branch circuits and controls.

(10%) 4. Gate receipt check in, plug/unplug, and monitor refrigerated containers,  Maintain accurate temperature records.

From the inception of container operations at T6, ILWU Locals 8 and 40 represented the Port's longshore workers and marine clerks, respectively.[12]  The most recent collective bargaining agreement between the Port and these ILWU local unions was entered into in 1984 (the 1984 Port/ILWU agreement).  Save for some very limited attachments not relevant here, the 1984 Port/ILWU agreement is a four-page, doublespaced document with half of the last page reserved for the parties' signatures.

Leal Sundet, the ILWU Coast Committeeman for the Pacific Northwest area and a key player in this dispute, accurately described the 1984 Port/ILWU agreement as a "me too" agreement that effectively adopted the terms of the 1984 PMA/ILWU coastwise collective-bargaining agreement with a few reservations.[13]  The 1984 Port/ILWU agreement looked to the far more detailed PMA/ILWU collective-bargaining agreement for the essential terms and conditions of employment of the workers in the longshore and marine clerks unit at T6.  It contained nine sections.  At best, only four have relevance here:

- Section 1 recites that the parties have abided by the terms of "all previous ILWU-PMA Agreements and shall now abide by the terms and conditions of the current ILWU-PMA Longshore and Clerks Agreements, dated July 12, 1984 . . . subject to any provisions of such agreements that may be found to be illegal or unenforceable.

- Section 2, stripped of irrelevant verbiage, provides that the Port will continue to employ "members of

ILWU Local Nos. 8, and 40 to perform work assignments as specified in the ILWU-PMA Agreement dated July 12, 1984, at any 'Public Cargo Handling Facilities' operated by the Port . . . ."

- Section 8 contains four sentences addressing the term of the agreement.  The first sentence is a zipper clause.  The second provides that the agreement will be effective from July 1, 1984 "until at least 5:00 P.M., July 1, 1987."  The third provides for an automatic renewal on a yearly basis absent a written notice by May 1 of each year about a party's desire to modify the agreement.  The final sentence provides for the agreement to remain in effect during the negotiation of a new agreement.

- Section 9 provides the Agreement "shall be binding on the (Port's) successors and assigns."

Sundet testified without contradiction that the Port at one time belonged to the PMA, but was expelled from that multiemployer organization following a strike in the early 1970s.  No evidence shows that the Port itself ever belonged to the PMA during any period when it directly operated T6 as a container terminal.

The AGC's brief cites subsection 5D of the 1984 Port/ILWU agreement in support of the contention that Locals 8 and 40 are contractually obligated to honor the traditional assignment of the disputed reefer work at T6.  A similar finding was made in the *10(k) case*.  358 NLRB No. 102, slip op. at p. 4.  Entirely apart from the fact that the cited language in section 5D appears to apply to jurisdictional allocations between the ILWU and the Teamsters rather than the IBEW or any other DCTU labor organization, this argument presupposes that the ICTSI assumed and became bound by the 1984 Port/ILWU agreement when it leased the T6 container terminal.  I have concluded that ICTSI never became bound by the 1984 Port/ILWU agreement.

Claims abound in this case that the 1984 Port/ILWU agreement somehow remained viable as the principal agreement covering the terms and conditions of employment of the longshore workers and marine clerks at T6 after ICTSI commenced operating the facility by way of its annual renewal clause.  I find those claims lack convincing evidentiary support.  In fact, Sundet testified, again without contradiction, that the Port had in the past notified Local 8 that the 1984 Port/ILWU agreement was "null and void."  While his testimony alone would not be sufficient to establish that the automatic renewal provision of the 1984 Port/ILWU agreement had been forestalled at some time in the past, his testimony is sufficient to cast a shadow over the current vitality of that agreement.  But that aside, it is clear that when ICTSI took over the operation of T6, it did not adopt the 1984 Port/ILWU agreement.

But even assuming the continued viability of the 1984 Port/ILWU agreement for some period after its initial expiration date, that changed when MTC/PA directly employed the longshore workers and marine clerks as both of those entities became and remained PMA members until ICTSI took over the actual operation of T6 in February 2011.  As such, both MTC/PA and ICTSI would have been directly bound to the

---

[12]  In addition, ILWU Local 92 has historically represented the foremen and walking bosses at T6.  Their duties include relaying management's assignments directives to the longshore workers and marine clerks.  Local 92 is not involved in this proceeding.

[13]  Sundet formerly worked at the PMA for approximately 8 years and then switched sides.  The Longshore Division Coast Committee is a four-member body consisting of the ILWU president and a vice president along with two elected coast committeemen (one representing California terminals and the other represents the Northwest terminals) that negotiates and administers the PMA/ILWU collective-bargaining agreement.  Before his election as a coast committeeman, Sundet held several positions with various Oregon ILWU locals, including at least a partial term as Local 8's president.  Sundet is quite knowledgeable about the industry and its labor relations history.

successive PMA/ILWU agreements rather than the local me-too agreement negotiated by the Port.

Furthermore, the only reference to the 1984 Port/ILWU agreement in the T6 lease agreement merely states that the Port provided the lessee with a copy of that agreement. Although the 1984 Port/ILWU agreement provides for its application to the parties' successors, there is no evidence that ICTSI adopted that agreement and the lease did not require it to do so. Clearly, ICTSI had no legal duty otherwise to adopt the 1984 Port/ILWU agreement. *NLRB v Burns Security Services*, 406 U.S. 272 (1972) (holding that a successor employer does not automatically assume its predecessor's collective-bargaining agreement). Unquestionably, ICTSI has all the indicia of a successor employer at T6 under the *Burns* doctrine.

In addition, ICTSI's conduct negates any claim that it ever intended to adopt the 1984 Port/ILWU agreement and implement its terms. Instead, on May 18, 2010, Ganda submitted an application on behalf of ICTSI for PMA membership and that application was accepted the following month. Additionally, Ganda testified that it had been ICTSI's intention from the outset to become and operate as a PMA member. Some degree of confirmation of that intention can be found in the fact that Mullen became a member of the PMA's Pacific Northwest Oregon and Columbia River Area Steering Committee, a highly improbable appointment for an official of an entity connected to the PMA only by means of a local me-too agreement. For these reasons, I have concluded that ICTSI's actions demonstrate that it chose not to adopt the 1984 Port/ILWU agreement. Instead, it chose to become bound directly to the existing PMA/ILWU agreement when it applied for and became a member of the PMA.

The Respondents' work preservation claim under *National Woodworkers*[14] is grounded on their belief that ITCSI Oregon became bound directly by all of the terms of the PCL&CA when it became a PMA member and that this coastwise collective-bargaining agreement requires member companies to use ILWU-represented workers to perform the disputed reefer work at Portland. As with the DCTU agreement, the PCLCD portion of that agreement makes no specific reference to the disputed reefer work. But section 1.7 of the PCLCD provides that it applies to "the maintenance and repair of containers of any kind . . . and the movement incidental to such maintenance and repair." Section 1.71 provides that the agreement applies to the "maintenance and repair of all stevedore cargo handling equipment" and section 1.76 requires that the "Employers shall assign work in accordance with Section 1 provisions and *as may be directed by the CLRC or an arbitration award*." [Emphasis added.] Section 1.76 further requires employers to defend decisions of the CLRC or the coast arbitrator in any "legal proceeding" and states that the PMA "shall participate along with the individual Employers assigning the work in any legal proceeding."[15]

The PCL&CA is administered by the Coast Labor Relations Committee (CLRC) that oversees the application of the agree-

ment for the entire West Coast. It is composed of representatives of the ILWU and the PMA. The entities have an equal voting power within the committee so that all CLRC decisions are either unanimous or deadlocked. Contractually, deadlocked decisions may be referred to the coast arbitrator, currently John Kagle, for resolution. With rare exception, the CLRC meets in San Francisco where the headquarters of both organizations are located. The decisions made by the CLRC bind all parties at all West Coast ports. A decision by the CLRC that the dockside reefer work at T6 is work covered by section 1 of the PCLCD is the foundation for the Respondents' arguments in this dispute.

As a coast committeeman, Sundet personally participated in the negotiation of the 20082014 PCL&CA on the union side and frequently participates as an ILWU representative on the CLRC. Prior to 1978, he testified, the dockside maintenance and repair work (which from ILWU's perspective always included the reefer work at issue here) had been left to local agreements. However, under the 1978 PMA/ILWU agreement, the maintenance and repair work became subject to the coastwise PCLCD. Still, that agreement provided that PMA employers with a past practice of subcontracting maintenance and repair work to employers that did not employ ILWU-represented labor before the effective date of the 1978 agreement could continue to engage in this practice. Ultimately, this exception was construed to mean that those PMA employers to transport their exemption to other locations, thereby leading to the spread of this subcontracting practice at the expense of jobs the ILWU members considered to be their own.

Sundet further testified that the 2008 agreement ended the subcontracting of all maintenance and repair work except at those locations where a PMA member company had an existing collective-bargaining agreement with another labor organization to perform that work. In exchange for this concession from the PMA that the ILWU thought would stem the erosion of maintenance and repair jobs for the workers it represented, the ILWU agreed to cooperate with the introduction of additional mechanical and robotic equipment at West Coast terminals designed to improve efficiency even though these technological advances would inevitably displace some ILWU equipment operators.

This arrangement was implemented within the 2008 PMA/ILWU agreement by means of a Letter of Understanding (LOU) attached to the 2008 PCLCD. The LOU designated excepted locations to the 2008 prohibition against subcontracting by labeling them as "red-circled," meaning that the existing practice of using non-ILWU labor could continue but only at those site-specific locations. From the ILWU's perspective, this approach served to stop the further spread of the practice of using non-ILWU labor to perform maintenance and repair work. The LOU did not recognize any red-circle work at any Portland terminal.

Sundet either could not or would not explain the complete exclusion of the Portland terminals from the LOU's red-circling process even though the electricians at T6 had historically performed the dockside reefer work there. Bill Wyatt, the Port's executive director, also stated in a June 12 letter responding to a carrier executive pressuring the Port to reassign the dockside reefer work to ILWU-represented workers that he could not

---

[14] *National Woodwork Mfrs. Assn. v NLRB*, 386 U.S. 612 (1967).

[15] The PMA did not seek to intervene in this unfair labor practice proceeding.

10                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

understand the exclusion of the Portland terminals from the LOU.

However, I find it fair to infer the obvious: the reason no work at any Portland terminal (including specifically the T6 dockside reefer work) was red-circled in the 2008 LOU undoubtedly resulted from the fact that MTC/PA, then the PMA-member stevedore contractor at T6, maintained no non-ILWU bargaining agreements at Portland that would qualify for red-circling under the LOU process. In addition, the Port, which did maintain the critical non-ILWU agreement with the DCTU that is at issue here, did not qualify to participate in the LOU red-circling process because it was not a PMA member. The Respondents' brief at page 7 effectively concedes as much. It states:

> Terminal 6 was not red-circled because at the time of the 2008 contract negotiations, the Port of Portland controlled the work as the terminal operator and was neither a member of PMA nor subject to the terms of the PCLCA. The red circle exception applied only to the negotiating companies who had direct CBA with other unions.

For reasons described later, I find these procedural formulations that precluded essential parties from participating in negotiating the 2008 LOU exceptions amounts to the Respondents' Achilles heel affecting the entire outcome of this case.

### E. The ILWU's Initial Efforts to Obtain the Dockside Reefer Work at T6

Paragraph 5 of the June complaint alleges Respondents had a dispute with the Port over the dockside reefer work and that it engaged in a variety of activities to compel the Port to reassign that work from the Port electricians to employees they represent.

ILWU officials knew about and followed the Port's lease negotiations with ICTSI.[16] Sundet asserted several times that he had received a verbal assurance before the conclusion of the lease negotiations with ICTSI from Sam Ruda, the Port's director of marine and industrial development at the time, that the Port would not stand in the way of the ILWU acquiring the dockside reefer work when the new lessee took over at T6 if the ILWU obtained it through some available arbitral process.

On February 10, 2011, 2 days before the Company commenced the actual operation of T6, Labor Relations Committeeman (LRC) William O'Neil from Local 8 sent a letter to Ganda welcoming his company to the terminal as its new operator. The letter also sought to stake Local 8's claim to several types of work, including the dockside reefer work. In relevant part O'Neil's letter stated:

> In regards to our future relationship, the Union wishes to remind ICTSI that the 2008 Memorandum (sic) of Understanding requires that PMA-member companies recognize their obligations under the PCLCD. The Union understands that the contract changed significantly in 2008 in the areas of mainte-

nance and repair of all PMA-member company equipment on any dock owned or leased by PMA-member companies.

To that end, the Union feels that the PCLCD is clear on reefer repair, chassis repair, chassis tires, reefer monitoring, plugging/unplugging of reefers in the yard, and the repair and maintenance of all other equipment owned or operated by any PMA-member companies. The Union asks that you respond to this letter in writing related to the issues mentioned above stating your future intent of supplying that work to the ILWU workforce.

Ganda rejected O'Neil's claim to the dockside reefer work in a letter dated February 15.[17] The reasons he provided state:

> Please rest assured that ICTSI has carefully considered its obligations to the Union under the 2008-2014 PCLCD and the July 2008 Memorandum of Understanding and plans to meet those obligations. However, certain work mentioned in your letter, for example, the plugging, unplugging and monitoring of reefer units as well as other electrical work, such as on the container cranes, is not within ICTSI's control. As you know, ICTSI is operating Terminal 6 pursuant to a 25-year lease with the Port of Portland, a lease that was entered into before ICTSI became a PMA member subject to the PCLCD. During the course of negotiations leading to the execution of that lease, the Port insisted that certain work that had for many years been performed by Port employees pursuant to the Port's labor agreement with the District Council of Trade Unions continue to be the Port's responsibility. As a result, Section 323(a) of the lease states that, for so long as the DCTU agreement with the Port remains in effect, the DCTU-represented employees of the Port must continue to perform all DTCU work covered under the DCTU Agreement. In entering into the lease, ICTSI had to agree to accept the Port's utilization of the DCTU employees to provide that work and ICTSI is further compelled, under Section 2.8, not to take any action that would cause the Port to be in violation of the DCTU Agreement.
>
> It is ICTSI's understanding that the DCTU-represented employees of the Port have performed the plugging, unplugging and monitoring of the reefer units at Terminal 6 since the terminal commenced operations in 1974. Similarly, the DCTU-represented employees of the Port have been performing electrical work on the cranes at Terminal 6 for many years. This work has clearly been covered by DCTU Agreement in the past and continues to be so covered.
>
> Under these circumstances, ICTSI has no right to control the work in question and must, consistent with its lease obligations, refrain from any action that would interfere with the continued performance by Port employees of work that that they have historically performed and that is covered by the DCTU Agreement.

---

[16]  At the time, Bruce Holte, Local 8's secretary-treasurer, served as a member of the Port Commission. In his role as a commissioner, he voted to approve the lease.

[17]  Following O'Neil's lead, Ganda copied Sundet with his response. Sundet claimed to have no recollection of Ganda's February 15 letter even though he conceded he could have received it.

Section 2.8 of the Port/ICTSI lease referenced in Ganda's letter states:

> The Lessee acknowledges that the DCTU Work is subject to the DCTU's jurisdiction under the DCTU Agreement. For so long as the DCTU Agreement remains in effect with respect to the Terminal, the Lessee shall not (i) perform, or except as permitted hereunder, cause to be performed, at the Terminal any DCTU Work or (ii) undertake any other action that would cause the Port to be in violation of the terms of the DCTU Agreement. The Lessee shall be responsible for any claims, including any labor claims that arise from the Lessee's failure to comply with this Section 2.8.  /GC Exh. 22 at 40.[

And section 3.23(a) of the lease, also referenced in Ganda's letter, provides:

> The Port shall, for so long as the DCTU Agreement remains in effect with respect to the Terminal, make available to the Lessee the DCTU Employees for the provision of the DCTU Work. The Lessee shall accept the Port's utilization of the DCTU Employees with respect to the provision of the DCTU Work and shall, in accordance with Section 3.23(d), accept work performed by the DCTU Employees at such time as the Lessee determines that such work complies with the provisions of this Agreement (including the Operating Standards) and applicable Law. The Port shall have responsibility for the conduct of the DCTU Employees in performing the DCTU Work. [GC Exh. 22 at 58.]

Section 3.23(e)(ii) of the lease, not cited in Ganda's letter, supports a conclusion that ICTSI had a mandatory obligation to use DCTU labor to perform all historical work those labor organizations had always performed at T6, including the dockside reefer work. It states:

> In the event the DCTU Agreement is not in effect with respect to the Terminal, the Lessee *shall not be required* to utilize the DCTU Employees with respect to the provision of the DCTU Work and the provisions of Sections 3.23(a) through (d) shall no longer apply. [GC Exh. 22 at 59–60; emphasis added.]

The lease agreement defines DCTU Work as "the work to be undertaken by the Port at the Terminal by the DCTU employees subject to the DCTU Agreement." It defines DCTU Employees as "the employees of the Port subject to the DCTU agreement" and the DCTU Agreement as "the agreement between the Port and the DCTU at the Marine Terminals, effective July 1, 2005 to June 30, 2009, and all amendments thereto." (GC Exh. 22 at 6.)

Following the February 2011 O'Neil/Ganda exchange of correspondence, the Company used the Port's electricians to do the dockside reefer work.

Beginning on March 9, some 13 months after O'Neil claimed the dockside reefer work on behalf of Local 8-represented workers, and continuing through August 21, Local 8 filed lost-time grievances (also occasionally referred to as pay-in-lieu grievances) against ICTSI and the PMA-member carriers whose ships transported reefers into and out of T6. Altogether Local 8 filed 83 separate grievances in that period but many alleged contract violations occurred on multiple days.

The grievances sought lost pay for longshore workers from the Company and the carriers for each occasion when the Port electricians performed the dockside reefer work.[18]

These grievances set in motion the contractual dispute resolution mechanism in the PCLCD. The initial step, conferences within the joint port labor relations committee composed of PMA/ICTSI representatives and Local 8 officials, failed to resolve any of them. Initially, the Portland area PMA labor relations representatives represented ICTSI and the carriers, and defended their positions denying liability for the pay-in-lieu grievances. Eventually, a hearing was scheduled before Area Arbitrator Jan R. Holmes on May 31.

After the arbitration hearing was scheduled, ICTSI's attorney, Michael Garone, contacted Todd Amidon, a senior lawyer in the PMA's legal department to discuss the grievances. The two exchanged a few phone calls and emails in the early part of May. Garone sent a draft brief to Amidon the he had prepared in support of the Company's position. After reviewing Garone's draft and discussing the grievances with the PMA's labor relations professionals, Amidon conducted a telephone conference with Garone, Terminal Manager Mullen, and the Portland PMA labor relations representative, Mike Dodd. Amidon provided them with the PMA professional staff's pessimistic assessment that a successful defense could be mounted against the pay-in-lieu grievances. He provided this summary:

> In preparation for the conference call (with Garone, Mullen and Dodd), I consulted with labor relations staff after reading (Garone's draft) brief to try and learn more about the merits of the case. I spoke to (Richard) Marzano (PMA's Coast Director for Contract Administration and Arbitration) and I spoke to Andy Hathaway who is the (PMA) area manager for the Pacific Northwest and Mr. Dodd.
>
> So then I then explained to ICTSI our assessment of the likelihood that ICTSI would prevail on this grievance. And I explained that there were really two issues that they were bringing up themselves. One was whether or not this work is work covered by Section 1, the jurisdictional provisions of the Pacific Coast Longshore Contract Document and (second) was whether or not even if that work is covered under the collective-bargaining agreement, ICTSI's argument that its lease agreement with the Port precluded it from assigning this work to the ILWU would carry the day and be a valid defense to the jurisdictional assignment.
>
> So I covered the first issue and explained that under our assessment, that ICTSI has virtually no chance of winning. I'm sorry, no chance of winning on the jurisdictional issue. That it was clear in our mind that the on dock plugging, unplugging and monitoring of refrigerated containers is work covered by the Section 1 of the agreement with the only exception being the red circle provisions which carve out in some terminals work that is not within the ILWU's jurisdiction.

---

[18] The March-August grievances are the key component of the allegations in the August complaint but serve only as background for the allegations in the June complaint.

12    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

And then I also explained that we saw next to no chance that ICTSI would prevail in this argument, that the lease with the Port excused it from complying with the jurisdictional provisions of the contract.

I also went over a few other provisions in the collective bargaining agreement that I had mentioned to Mr. Garone in an email that I thought were going to be important and significant to this case. One is Section 1.74 that talks about as I recall no subterfuge. And I mentioned that, you know, I really—we really thought it would be a significant obstacle under the agreement even if the arbitrator would consider the lease agreement which we didn't think she would. But even if she did, for ICTSI to persuade her that this wasn't some form of subterfuge for ICTSI to be taking work away from the ILWU and we spoke about Section 1.82 of the collective bargaining agreement which is a provision that mentions that companies that join the PMA after the agreement was formed in 2008 are bound by all its terms. And so that's another reason why we don't think that the arbitrator would be persuaded by your lease agreement argument you—the deal is you got to come in ready to take the agreement, every bit of it, not parts – not the parts you didn't give away to somebody else.

And then finally I spoke at length about Section 1.76 of the collective bargaining agreement which is a provision that says that once the Coast Labor Relations Committee or an arbitrator has determined that work belongs to the ILWU under the collective bargaining agreement, PMA and its member companies must participate with the ILWU in defending that work assignment. And if I didn't quote that directly, exactly right, I'll just refer you to the PCLCD.

Following this call, the PMA made an executive decision that the dockside reefer work at Portland belonged to ILWU-represented worker under section 1 of the PCLCD. On May 18, James McKenna, PMA's president and chief executive officer, and Amidon conducted a conference call with Garone, Ganda, and Mullen to inform them of PMA's decision to favor the ILWU's claim for the dockside reefer work. When the ICTSI group protested, McKenna told the Company's officials and its attorney that they had to "take one for the team," a retort that meant the PMA could no longer support their position so the Company needed to assign the dockside reefer work to ILWU workers.

On May 23, the CLRC convened a special meeting at the ILWU's request to consider ICTSI's continued use of the Port's Local 48-represented electricians to perform the dockside reefer work. The minutes of the meeting (CLRC-012-2012) reflect that Sundet attended as one of the ILWU committee members.[19] As the following excerpt from the meeting minutes reflect, this high-level committee reached a unanimous conclu-

sion that the dockside reefer work at T6 belonged to the ILWU-represented employees:

The Committee reviewed the 2008-2014 PCLCD, specifically the new language in Section 1.7 and sub-sections and the 'Red Circle" LOU (Letter of Understanding), along with Kagel Award C-07-2011. After discussion and consideration of the matter, and in accordance with its authority under Section 17.26 and 17.27 of the PCLCD, the CLRC agreed the work in dispute, currently being performed by other than ILWU workers, is work that is covered by Section 1.7 at the Terminal 6 facility in Portland and shall be performed by ILWU represented workers. The Committee further agreed that, in this instance and under the facts of this case, the terms of the lease with the Port of Portland does not alter ICTSI's contractual obligation to the ILWU under the PCL&CA.

*The Committee instructs ICTSI to assign the subject work to ILWU represented Longshore personnel in accordance with the PCLCD and this CLRC agreement. The Committee further instructs ICTSI to comply with Section 1.76, PCLCD.* [Emphasis added.]

The Kagel Award C-07-2011, noted in CLRC-012-2012, affirmed an earlier award of a subordinate area arbitrator finding that the work of plugging and unplugging reefers onboard ships was PCLCD section 1 work. Presumably, the CLRC cited the Kagel Award because the work is virtually identical whether performed dockside or aboard ship. Under the contractual rules of construction contained in section 17 of the PCLCD, decisions of the CLRC constitute a binding interpretation of the PMA/ILWU collective-bargaining agreement. As a result, this CLRC action effectively mooted parallel grievance processing at the local level because those representatives, including the area arbitrator, would have been bound to apply CLRC-012-2012. In fact, on June 4 Portland area arbitrator Holmes did exactly that.

### F. The June Complaint Allegations

#### 1. Complaint paragraph 6(a): Threats at the May 21 Ganda/Sundet meeting

Complaint paragraph 6(a) alleges that Sundet made a variety of threats on May 21 in furtherance of the ILWU's dispute with the Port over the dockside reefer work during a meeting between the two at Stanford's Restaurant located in the Portland airport.

Two days before the specially-convened CLRC meeting that ordered the Company to assign the dockside reefer work to the ILWU-represented workers discussed above, Sundet arranged through Local 8 President Jeff Smith to meet with Company CEO Ganda on May 21 at Stanford's en route back from Seattle to his office in San Francisco. Ganda said that Sundet began their meeting that day by asking if the PMA had instructed the Company to express a preference for the ILWU to perform the dockside reefer work at the upcoming NLRB 10(k) hearing on May 24. Before Ganda could answer, Sundet told him that he did not have a choice because the ILWU would be unhappy if he did not state at the 10(k) hearing that the Company preferred to have the dockside reefer work performed by ILWU labor.

---

[19]  The other committee members representing the ILWU were the ILWU president and two other ILWU representatives. Marzano represented the PMA but, according to Amidon, once PMA President McKenna reached a decision to back the ILWU's claim for the dockside reefer work at T6, Marzano became obliged to do the same.

Sundet then broadsided Ganda with a whole series of threats (some direct, some implied) designed to influence the Company's preference at the 10(k) hearing. By Ganda's account, Sundet told him that the Company "would pay the price"; that the ILWU "can fuck you"; that if Ganda knew him he would know that he was the "guy that can fuck you badly"; that he could not guarantee what would happen with Hanjin, the Korean-based container carrier that, at the time, accounted for slightly more than 80 percent of the T6 business; that he would make sure that Hanjin did not renew its contract with ICTSI when the current one expired; that the PMA would not have allowed ICTSI to join the PMA if it had known what its lease agreement with the Port said about the disputed work; and that the PMA could fine ICTSI and expel it from membership.

Throughout, Ganda asserted that the Company was caught in the middle of a jurisdictional battle that it had nothing to do with and if Sundet set out to drive business away from T6, he would be hurting his own membership. Sundet claimed to Ganda that he had a verbal agreement with the Port executives to go along with the assignment of the disputed reefer work to the ILWU while foregoing any claim the electrical maintenance work on the Port's T6 cranes, also performed by the Local 48 electricians, in exchange for the ILWU's support of the T6 lease before the Port Commission.

Ganda, in his reluctance to take a position he thought contrary to the lease terms for fear that the Port would claim a breach of that agreement, told Sundet that he felt like he had a gun being held to his head. In response, Sundet told him, "And I'm holding the other gun to your head."

Sundet next proposed that ITCSI permit PMA to speak on its behalf at the 10(k) hearing, but Ganda quickly rejected that suggestion on the ground that the PMA was not a party to the lease his firm had with the Port. Sundet also told Ganda that the future of further automation projects currently underway and in the planning stage depended on the ability of PMA to assure the ILWU that the PMA member-companies would honor the ILWU's jurisdiction claims. The meeting ended when the time came for Sundet to catch a plane.

Although Sundet provided an even more detailed and graphic account of this meeting, he denied making the threats Ganda attributed to him, including the threats about causing problems, forcing carriers to bypass T6, or shutting down that terminal. But he admittedly believed that the Company's pending 8(b)(4)(D) charge giving rise to the 10(k) hearing scheduled for later that week amounted to a contrivance between ICTSI and Local 48 to interfere with what he perceived to be the likely success of the parallel Local 8 grievances in contractual dispute resolution pipeline at that time. Sundet told Ganda at the outset of their meeting that the 10(k) proceeding initiated by the Company amounted to "an aggressive . . . [a]nd a manipulative act" on its part that undermined the PMA/ILWU agreement.

Sundet subscribes to the widely-held view that the only factor that really counts in a Board 10(k) proceeding is the employer's work-assignment preference. Hence, after criticizing the Company for invoking the NLRB procedures, Sundet urged Ganda to state the Company's preference at the 10(k) hearing for ILWU-represented workers to perform the dockside reefer work. If he did that, Sundet assured Ganda, "there's no harm

here, because then the Board will rule that it's ILWU work, guaranteed." Ganda declined to do that citing the Company's lease with the Port. When Sundet pressed for an explanation, Ganda told him the lease required that his firm use the Port electricians to perform the dockside reefer work.

Sundet claimed that he had never heard of this lease requirement before. Regardless of the veracity of this claim,[20] Sundet pressed Ganda to state a preference for ILWU workers anyway because there would be nothing Local 48 could do about a 10(k) award to the ILWU. If Local 48 tried to picket, Sundet asserted, the NLRB would promptly seek a 10(l) injunction against that type of activity and "then it's all over with . . . everything's fine." Obviously skeptical of Sundet's assertions, Ganda said he would have to talk with his lawyers.

Failing to obtain Ganda's immediate acquiescence to express a preference for the ILWU-represented workers, Sundet then argued that the Company's strategy of seeking a 10(k) determination would not work. He asserted that even if the Board awarded the disputed reefer work to the Local 48-represented workers, it would have nothing to do with the carriers who owned the reefers because they also belonged to the PMA, and thereby had an obligation to honor the PMA/ILWU agreement. "You need to understand," Sundet admittedly told Ganda, "the carriers can't come to Portland if they're in violation of the (PMA/ILWU) agreement."

Ganda again demurred saying he needed to speak with the Company's lawyers. He added that he felt like the Port had a gun to his head and that "you've got a gun to my head." Sundet replied that he needed to decide "which gun's got the bigger bullet." Sundet asked: "What can the Port do to you?" When Ganda replied that the Port might sever the lease and require payments, Sundet scoffed at his response, asking if he believed what he had just said, and then provided an alternate answer seemingly based on his instinctive assessment of the situation:

> Do you really think the Port's going to do that? The Port barely got you to sign the lease. They have nobody else out there. They've got nothing. The Port's not going to do that. It's not going to happen.

After having said that, Sundet offered to speak with Port officials to obtain their assurance to renegotiate the problematic lease terms provided the Company expressed a preference to have the ILWU-represented workers perform the disputed reefer work. Asked if that would be satisfactory, Ganda indicated that it might be but that he still needed to speak with his lawyers. Their discussion concluded with Sundet telling Ganda:

> Okay; okay, fine. Let me talk to the Port and we'll see if we can't get it to where it's all right for you to pick us in this 10(k) process, and then all this can go away. Maybe that's a better solution than us even going to the arbitration.

---

[20] As noted above, Sundet had been copied on the exchange of letters between Local 8's O'Neil and Ganda in February 2011 where Ganda explained that ICTSI could not use ILWU-represented labor on the disputed reefer work because of the lease terms.

In fact, Sundet did speak the following day or the day after with Dan Pippenger, the Port's general manager of marine operations. He sought an assurance from Pippenger that the Port would not act against ITCSI Oregon if that company expressed a preference for the use of ILWU-represented workers at the 10(k) hearing. According to Sundet, Pippenger could only state to him that there was no "Plan B" at T6 other than ICTSI, but he would have to get the assurance Sundet sought from "upstairs." Sundet never heard back from Pippenger or any other Port official concerning this subject.

2. Complaint paragraphs 6(b) and (aa): the May 24 threats

(a) Complaint paragraph 6(aa) alleges that on May 24 in the hearing room at the Portland NLRB office, Sundet threatened to shut down the Company's operations unless it began using workers represented by Local 8 in place of Port electricians to perform the dockside reefer work.

The 10(k) hearing commenced May 24 in the subregional office at Portland. Lyle Denning, a Port electrician represented by Local 48, attended the first day of the 10(k) hearing. He sat in the front row of the spectator section just in front of John Mikan, a gearlocker foreman at T6 who is represented by an ILWU local. Sundet sat at the ILWU counsel table 2 or 3 feet in front of Denning. Toward the end of the morning session, Sundet turned around and, speaking to Mikan, said that they were going to "shut down ICTSI." Sundet did not deny the remark that Denning attributed to him.

(b) Complaint paragraph 6(b) alleges that on May 24, outside the Portland hearing room, Sundet threatened to shutdown the Company's operations unless it began using workers represented by Local 8 in place of Port electricians to perform the dockside reefer work.

The second event on May 24 occurred during a chance encounter between Terminal Manager Mullen and Sundet on the street outside the hearing room after the close of the first day of the 10(k) hearing. Mullen recalled that they first exchanged pleasantries and then Sundet turned to the dispute. Sundet told Mullen that the Port had really "screwed" the Company. Speaking of his company's predicament, Mullen admitted that they were in a really tough spot but went on the tell Sundet that the ILWU did not have to "hard time" them, meaning engage in various types of work actions. That prompted Sundet to tell him that the ILWU could not allow a company to sign a lease with a port authority, join the PMA, and then keep ILWU workers from their work. Mullen told Sundet that "we've got a gun to either side of our head," and explained that the Company could not break its lease with the Port. Sundet responded by telling him that was what ICTSI had to do.

The two continued their exchange for a few more moments until Sundet, by this time somewhat angry and animated, claimed that Ruda had assured him the ILWU could have the dockside reefer work if they obtained it by an arbitration award and that he (Ruda) had perjured himself at the hearing that day by testifying there was no such deal. Toward the end of their exchange, Sundet told Mullen that ICTSI needed to give the disputed work to the ILWU. After Mullen replied that he did not "see that happening," Sundet told him "you might as well tell Hanjin and Hapag to pack up because we're going to send

them packing." According to Mullen, these two carriers account for nearly 98 percent of the Company's work at T6.

The 10(k) hearing concluded on May 30. At some later time, Sundet told Stephen Hennessey, PMA's chief operating officer, and PMA Coast Director Marzano that the PMA carriers needed to know that if the 10(k) proceeding ultimately resulted in the assignment of the dockside reefer work outside the scope of the PCLCD (as did happen), the carriers would be in violation of the PCLCD. Sundet admitted that he wrote letters to the PMA carriers around the same time stating as much. This could not have been news to the carriers as Local 8 had been filing pay-in-lieu grievances against them since March claiming violations of the PCLCD because the carriers permitted work on their reefers at T6 to be performed by non-ILWU labor.

3. Complaint paragraph 6(y): The May 25 threats

Complaint paragraph 6(y) alleges that Local 8 President Jeff Smith threatened in a telephone conversation that the Port was going to kick the Company out of T6 and that the Respondents would cause Hanjin to stop doing business at the Port.[21] According to ICTSI's CEO Ganda's uncontradicted, credible testimony (Smith did not testify) Smith demanded during a telephone call around 5 p.m. on May 25 that the Company assign the dockside reefer work to Local 8 workers. Smith told Ganda that if this demand was not met, the ILWU would put ICTSI out of business and would run every Hanjin container out of Portland.

4. Complaint paragraph 6(c): the June 1 and 3 slowdowns

Complaint paragraph 6(c) alleges that unnamed agents of the Respondents appealed to and ordered Company employees to engage in a work slowdown on June 1 and 3 by having those workers perform work at reduced speeds in order to pressure the Company to use workers represented by Local 8 in place of Port electricians to perform the dockside reefer work.

On June 1, shortly after the close of the 10(k) hearing, the Local 8-represented workers at T6 engaged in intermittent slowdown activities. Brian Yockey, the Company's marine manager at T6, attended a June 1 meeting on the third floor of the administration building. From that location, Yockey could view nearly the entire container yard to the north. At around 2 p.m. that day, he observed about a dozen trucks lined up in the container yard sections where the import reefers are placed and reach stacker operators, represented by Local 8, "just sitting there."[22] The longer Yockey watched the more he became convinced that an intentional slowdown was in progress. This is his account of his observations at the time:

---

[21] Complaint par. 6(y) (set forth in the July 24 amendment to the June complaint) alleges erroneously that this conversation occurred on June 5.

[22] Import containers are typically stored in one of the 70s sections at T6 while awaiting transport from the terminal to a location in Portland or environs. The reach stackers are motorized industrial machines used in the stevedoring industry to lift containers and transport them short distances as needed. The reach stackers and a similar device called a toploader are the two primary types of container handling equipment in use at T6.

What I observed that day was the reach stacker operator would sit there, and he would wait for minutes on end. And then he would roll forward. And he would place the beam on top of the container to be delivered. And he would sit there and he would wait for minutes on end. And then he would pick it up, and then he would back up and he would wait. Then the truck driver would pull forward. And the (reach) stacker would sit there holding the container, and he would wait for minutes on end. And then he would pull forward. And then he would sit the container down on the chassis. And then he would wait. And then he would unlock the frame. And then he would pick it up. And then he would back up. And then, you know, like I said, instead of it taking a minute, it would take six, seven, eight minutes.

After watching what was going on for about half an hour, Yockey drove around other areas of the container yard in his pickup. During his drive, he noticed four to six other reach stack operators performing their work in the same slow fashion. Yockey said no unusual conditions existed that would justify such a variance from the ordinary work pace.

On June 3, Port electrician Denning worked from 8 a.m. to 3:30 p.m. during the loading and unloading of an unnamed container ship. If reefers are offloaded from a ship, the electrician responsible for plugging it in after it is spotted in the container yard follows the longshore driver from the dock area to the yard location where it is decked. Denning recalled that throughout the shift that day the drivers would creep along at about 1 mile per hour for no apparent reason. Ordinarily, he said, they operated at or near the terminal limit of 15 miles per hour.

In addition, Denning recalled that two cranes were used to offload from the ship that day. He also observed that the Local 8-represented crane operators also worked at a very slow pace throughout the shift. Ordinarily, Denning reported, the crane operators offload up to 25 containers per hour but on June 3 they offloaded only 3 or 4 containers per hour.

5. Complaint paragraphs 6(e), (f), (g), and (bb): the June 4 "self-assignment" activity, the refusal to refer workers, and the work stoppage

On June 4 the container ship *Hanjin Washington* had docked at the T6 berth 605 to off load empty containers and to take aboard loaded containers. The relevant events of the day began with conduct that Sundet characterized as the "self-assignment" of the dockside reefer work to employees represented by Local 8.[23]

(a) Complaint paragraph 6(f) alleges that Local 8 LRC Mulcahy and other agents of Respondents caused TMC workers to engage in a work slowdown on June 4 to support Respondents' dispute with the Port over the dockside reefer work by doing that work rather than their assigned duties.

On June 4 around 10 a.m., Port electrician Zackary Oliver observed Brian Correll, a TMC mechanic represented by Local

8, unplugging one of the decked reefers and confronted him about it. Correll told Oliver that he did not want to do that work but the order "came down from the top" so he had to do it. Port electrician Denning also observed Correll unplugging a different reefer that morning. Oliver and Denning saw Correll unplug about six reefers that day.

After learning of this activity, Todd Staple, the Port's marine maintenance manager, complained to Mullen about the TMC mechanics performing the dockside reefer work normally performed by his Port electricians. Mullen promptly requested that TMC Manager Preston Foster instruct the TMC workers to quit doing the dockside reefer work. Mullen also called Dave Echels, TMC's West Coast manager, and gave him the same message. After their conversation, Echels sent Mullen an email threatening to hold ICTSI liable for any losses resulting from grievances brought against TMC because of Mullen's "stand down" directive.

Although this evidence fails to implicate Mulcahy in any directive to Correll about performing dockside reefer work on June 4, Correll's assertion that he did so unwillingly because of an order from the top, when considered with the record as a whole supports the conclusion I have reached that the directive came from an some responsible agent at Local 8.

(b) Complaint paragraph 6(bb) alleges that on June 4 Local 8 LRC Stuart Wilson caused a work stoppage in support of Respondents' dispute with the Port by refusing to refer qualified workers from the hiring hall to the Company.

Around 3 p.m., the deadline for requesting or releasing a night gang under the local hiring hall rules, Marine Manager Yockey sought the assignment of a night gang to continue the *Hanjin Washington* work through Stuart Wilson, a Local 8 labor relations committeeman. Wilson refused to cooperate in securing a night gang for Yockey because he was "pissed at Elvis Ganda for everything that was going on with the electric work at Terminal 6." As a result, no work was performed on the *Hanjin Washington* that night. In the morning, the ship departed T6 without unloading all of the empty containers destined for Portland and without loading all of the containers that had been scheduled for shipment aboard that vessel.

(c) Complaint paragraph 6(e) alleges that Local 8 LRC Mulcahy threatened on June 4 to shut down the Company's operation at T6 unless the Company used workers represented by Local 8 in place of the Port electricians to perform the dockside reefer work.

Early in the afternoon on June 4, PMA labor relations representative Mike Todd notified Mullen that Local 8 had requested an immediate arbitration hearing over the assignment of the dockside reefer work. Area Arbitrator Holmes conducted a hearing concerning the dispute later that afternoon in the first floor conference room at the T6 administration building. Todd, Mullen, and Marine Manager Yockey appeared on behalf of the Company. Jack Mulcahy, at the time a member of Local 8's labor relations committee and an admitted agent of that union up to July 12 (see Jt. Stipulation 1), and other unnamed members of Local 8's labor relations committee represented the union.

At the conclusion of the hearing, Arbitrator Holmes found ICTSI out of compliance with CLRC-012-2012 and directed

---

[23] Sundet rationalized the "self-assignment" tactic by asserting that it amounts to an exception to the contractual no-strike commitment when done in response to an employer's failure to comply with a collective-bargaining agreement.

16                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

that it start assigning the dockside reefer work to employees represented by Local 8. Mullen told Arbitrator Holmes that the Company would not implement with the award.[24] A short while later Mullen accompanied by Yockey approached the union contingent in the parking lot to speak with Mulcahy and the union contingent. When Mullen attempted to explain the Company's position again, Mulcahy greeted him with an explective and then said: "[I]f you're not going to follow the contract, neither are we, all bets are off." Although Yockey recalled these remarks by Mulcahy were uttered in the conference room, his account otherwise corroborates Mullen's. None of the union agents involved testified. Although I find the evidence fails to show that Mulcahy made a threat to close down the Company's operations, I find that he did threaten the Company with unspecified reprisals by way of his "all bets are off" remark following his intentionally hostile greeting when Mullen approached him.

(d) Complaint paragraph 6(g) alleges that Local 8 agents Mulcahy, De La Cruz, Johnson, and others appealed to and ordered the Company's crane operators and loader operators to engage in a work stoppage in support of Local 8's dispute with the Port over the assignment of the dockside reefer work.

Following his encounter with Mullen and Yockey after the arbitration hearing, Mulcahy drove from the administration building parking lot northward onto the terminal property, and Mullen, accompanied by Yockey, went to his office on the second floor of the administration building. From that vantage point, Mullen and Yockey could see that the cranes used for loading and unloading the *Hanjin Washington* had stopped and that all other operations had come to a halt. Yockey said he observed the cranes "parked in the home position," meaning the position used when operators enter and exit the crane. Yockey described the ripple effect throughout the terminal operation when cranes actively loading a vessel stop operating as happened that day:

> I (saw) the cranes parked in the home position. That's where the operators get in and out of the cranes. So they're obviously not driving. That also impacts all other aspects of our operation. The reach stackers . . . (are) there to handle containers. If the crane is not handling containers, the reach stackers are at a standstill. The truck drivers, they're transporting containers from the yard to the vessel. If the cranes aren't moving, the truck drivers are in standby, if you will.

Assistant Marine Manager Harvey Witham, who directs the loading and unloading of vessels at T6 and supervises the longshore and marine clerks involved with that task, was on duty overseeing the *Hanjing Washington* stevedoring work during the late afternoon of June 4. This work utilized three cranes (each with two operators) and three gangs of longshore workers. Witham said the crane operators and all three gangs ceased working at about 6:05 p.m. and congregated in the breakroom for a discussion with Mulcahy, Torre Delacruz, another un-

named Local 8 labor relations committeeman, and Kevin Johnson, a Local 8 business agent.

Witham described near frantic efforts to get the crews back to work. He first requested one of his foremen to direct the crews back to work a couple of times but none of the crewmembers complied with the foreman's instruction. Witham then called for the general foreman, who happened to be on board the vessel at the time, to come down and instruct the crews to return to work. The general foreman did so but without success. At about 6:20 p.m., the meeting between the crews and the union officials finally ended and the crews began to return to work. Whitman estimated that the direct cost of this unauthorized work stoppage that lasted about half an hour at approximately $2000 per crew.

### 6. Complaint paragraphs 6(h), (i), (j), (k), and (cc): the June 5 work stoppages

On June 5, the officials of Local 40 became overtly involved in supporting Local 8's effort to secure the dockside reefer work-by-work actions. Dane Jones, the Local 40 secretary-treasurer and business agent, received a copy of CLRC-012-2012 shortly after May 23. He first conferred with Local 40's president, Dawn DesBrisay, the union's executive board, and its labor relations committee about the CLRC decision. He then informed the Local 40 membership that the dockside reefer work "was properly assigned to ILWU Local 8 mechanics."

Complaint paragraphs 6(h), (i), (j), (k), and (cc) allege individual segments of various short work stoppages that occurred on June 5 when the Company's marine clerks began instructing truckdrivers with arriving reefer to bypass the reefer blocks where the Port electricians normally performed their initial check and proceed straight to their assigned drop spot in the container yard. Based on the account provided below, I find this action resulted from a coordinated effort by agents of Locals 8 and 40.

Port electrician Oliver overheard a radio communication between an unidentified Company marine clerk represented by Local 40 on the morning of June 5 asking for a company gearlocker mechanic represented by Local 8 to unplug a reefer in section 46. Oliver arrived at the location first and unplugged the reefer but throughout the rest of the day he observed other company mechanics plugging in reefers in other areas of the container yard.

Around 9:30 a.m. that day, Port electrician Hines went to the reefer check-in area after receiving a text message about an incoming reefer. When he arrived there, he saw a truckdriver skip the usual stop at the reefer check-in blocks and proceed directly to a drop spot in section 48. Hines followed the truck and spoke to its driver about bypassing the reefer check-in blocks. The driver told Hines that the marine clerk he had spoken with during the initial check-in stop instructed him to proceed directly to his drop spot without the usual reefer check-in stop.

By that time, a contingent of others largely unknown to Hines arrived in company pickups and a lengthy conference followed. After about an hour, the driver was instructed to return to the reefer blocks and go through the proper check-in

---

[24] The Company's refusal to implement the area arbitrator's award resulted in the prompt issuance of CLRC 013-2012 affirming the award and its directive requiring ICTSI's compliance.

procedure. Hines followed and completed the usual reefer check-in report.

Thereafter, Hines and the truckdriver returned to the assigned drop location in section 48. A reach-stack operator lifted the container from the truck and the truckdriver drove away. When the operator started to lower the container, an unidentified longshore worker, ignoring the safety notice on all reach stackers warning persons to remain 40 feet away, grabbed the electrical cable and handed it off to other longshore workers present who plugged it into a nearby electrical bank. Hines said that Mike Nastari, the Company's crane and power manager, promptly fired the three longshore workers involved.

Based on Nastari's more detailed recollection of the event and the participants, I find that at least the final aspects of this engagement probably occurred in the early afternoon. By Nastari's account, Terminal Manager Mullen alerted him late in the morning of June 5 to be on the lookout for gearlocker mechanics that Nastari oversees performing the dockside reefer work. After receiving Mullen's alert, Nastari checked the day's delivery schedule and learned that several reefers would be delivered to the terminal early that afternoon.

Around 1 p.m., Nastari saw Local 8 Business Agent Johnson and Local 40 President Dawn DesBrisay in reefer section 49 along with three gearlocker employees. Suspicious of the motive for their unusual presence in that area of the container yard, Nastari summoned another company manager and a general foreman to join him in that area. When they arrived, Nastari and the other two learned that the gearlocker workers were there to perform the dockside reefer work on a reefer expected to arrive soon. Nastari told them the Company did not want them to perform that work and directed the mechanics to return to their normal duties at some distance from where they were. They ignored his instruction. When the reefer arrived and was lowered into place, the three mechanics proceeded to plug it into the electrical bank receptacle. Nastari promptly terminated the three workers.

Around 2:45 p.m. on June 5, Container Gate Manager Noa Lidstone instructed Verl Green, a marine clerk supervisor represented by Local 40, "to continue to direct his clerks to call the electricians for all plugging and unplugging of reefers on the terminal and to make sure that they flow the trucks to the reefer check-in area." DesBrisay, who was present at Green's desk at the time, told Lidstone that the marine clerks would not call the electricians because that was Local 8's work. After Lidstone insisted that the clerks call the Port electricians, DesBrisay told him, "[W]e don't care if the ships sit out here or if they don't call Portland, we're not going to call the electricians to plug in reefers."

Around 3:30 p.m., Nastari fired the two remaining gearlocker workers in the presence of Business Agent Johnson after they too ignored his direction to go back to their regular work rather than engaging in the dockside reefer work. These terminations left the Company with no mechanics to handle any rolling stock repairs or spills at the terminal.

Soon thereafter, Gate Manager Noa Lidstone began hearing several reports by the Local 8 machine operators reporting various mechanical breakdowns. Ordinarily, the gearlocker mechanics would be dispatched to repair the breakdowns. Nastari

proposed to Local 8 Business Agent Johnson, still present at the terminal, to put the last two mechanics he fired back to work if they agreed to refrain from performing the reefer work. Johnson refused the proposal.

Because of the absence of mechanics to perform the essential equipment repairs, the terminal closed approximately 30 minutes early that day. Lidstone estimated that about 90 trucks had entered T6 by that time and were waiting to be unloaded. He said that all of those transactions had to be canceled and the trucks sent away. Later, it was determined that the spate of reported equipment failures required almost no repair work other than replacing a single fuse on one loader. As a result, all were back in service on the second shift by 6:30 p.m.

### 7. Complaint paragraphs 6(l), (m), and (n): the June 6 work stoppages

(a) Complaint paragraph 6(l) alleges that Respondents caused employees to engage in a work stoppage by blocking a reach stacker operator's access to four outgoing reefers.

Shortly before 10 a.m. on June 6, Marine Manager Yockey noticed that four trucks had been lined up in the vicinity of the two principal reefer sections of the container yard for an unusual length of time. When he went to the area to investigate, he saw a TMC truck with some of that Company's mechanics blocking access to reefers that were to be loaded on the waiting trucks. As the TMC mechanics had no duties that required their presence in the area, Yockey contacted Gate Manager Lidstone to get the TMC truck moved.

Earlier Lidstone had arranged for a machine operator to go to the area to load the four containers on the trucks sent to transport them.[25] By the time he arrived at that area of the container yard, a company truck with some gear locker mechanics had pulled alongside of the TMC truck so that the reach stacker operator had no access to load the containers onto the waiting trucks. Because the gearlocker mechanics had no work in the area, Lidstone contacted Terry Murphy, the Company's maintenance and repair manager who oversees their work, to get them out of the way. He also contacted TMC Manager Preston Foster to arrange for the removal of the TMC truck. By the time the two trucks with the TMC mechanics and the Company's gearlocker mechanics finally moved, the operator's access to the reefers that needed to be loaded on the waiting trucks had been blocked for over half an hour.

(b) Complaint paragraph 6(m) alleges Respondents' responsibility for the Company's Local 8-represented mechanics insisting to the point of termination on performing the dockside reefer work instead of their own, company-assigned job duties on June 6.

Over the course of the morning on June 6, Terry Murphy fired 13 of the Company's mechanics he encountered either individually or in small groups in the reefer sections of the container yard where they had no assigned work to perform. When Murphy inquired about what they were doing there, he was told in each instance that they were there to perform the

---

[25] These four containers had been left behind when the *Hanjin Washington* departed T6 on June 4 without its full load due to the slowdown that day. An arrangement had been made to transport the four containers to Seattle by truck for loading onto that ship at that port.

18                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

dockside reefer work that came along that morning. Murphy directed all of the mechanics he encountered to return to their normal work area and perform their assigned work. He terminated them when they refused or ignored his directive.

(c) Complaint paragraph 6(n) alleges Respondents' responsibility for a work stoppage that occurred when the Company's operators took their equipment out of service on June 6.

At the start of the first shift on June 6, the Company had 10 container loading machines in operation. Between 11:30 a.m. and noon, after Murphy fired some or all of the mechanics that day, the machine operators took 8 of the 10 loading machines out of service. Four were removed allegedly because they did not have fire extinguishers on board, two purportedly had maintenance issues, and two supposedly could not be disengaged from the containers they had lifted. Murphy, who oversees the shop responsible for repairing and returning this equipment to service, claimed that he had never experienced so many pieces of equipment taken out of service in such a short period during all of his 35 years in this line of work.

Shortly after the end of the lunch period at 1 p.m., Lidstone saw Local 8 Business Agent Johnson meeting with the Company's loader operators (the employees who had taken their equipment out of service) in the corral area, a parking area between the administration building and the power shop where the motorized loading equipment is parked when not in use. Lidstone approached the group and through his foreman directed the operators to go back to work because fire extinguishers were not required on the loaders.[26] The operators ignored his order and walked away toward a nearby building.

Lidstone then requested that Johnson contact Local 8 LRC Stuart Wilson with whom Lidstone had discussed the fire extinguisher issue in the past. After Johnson spoke with Wilson twice, he told Lidstone that the four operators who had taken their equipment out of service over the fire extinguisher question could go back to work if Lidstone's foreman first conducted a safety instruction that included information about the location of the fire extinguishers at the terminal. Lidstone agreed. Following the foreman's brief safety class, the four operators started to return to work. One immediately refused claiming, for the first time, that his machine had a transmission problem. The three others returned to work.

Due to a failure to comply with certain overtime rules, 2 of the 5 loaders still operating were taken out of service so that by 2:30 p.m., only 3 of the Company's 10 loaders remained in operation. Between 4 and 5:30 p.m. the operators of those three loader machines removed them from service, one for unknown reasons, another because of loud noises, and the third because it could not be disengaged from a container. These actions forced Lidstone to close the terminal gate half an hour early that day. He estimated that 60 or so trucks waiting to get into the terminal were turned away. He also cancelled the transactions for about 17 trucks already on the terminal grounds and sent them "on their way."

At 6 p.m. that day, an arbitration proceeding was commenced by Arbitrator Holmes to consider these actions. At the conclusion of that hearing, she decided that the Local 8 officers and members were not guilty of creating a work stoppage or engaging in a job action.[27] However, she directed that Local 8 "provide skilled mechanics as needed" and refrain from giving directions to those workers contrary to work instructions provided by the Company.

### 8. Complaint paragraph 6(o): the June 7 work stoppage

Complaint paragraph 6(o) alleges that Local 8 LRCs Mulcahy, Wilson, De La Cruz, and Business Agent Johnson caused a work stoppage at T6 on June 8 by refusing to provide the Company with qualified mechanics.

Early in the morning of June 7, Maintenance and Repair Manager Murphy called the hiring hall asking to have 14 mechanics dispatched to T6 for the first shift starting at 8 a.m. Murphy needed skilled mechanics to repair the loader equipment taken out of service on June 6. Specifically, Murphy sought workers with the following skill sets: four qualified crane mechanics, four qualified reach stacker and top loader mechanics, two qualified shop mechanics, two certified welders, a parts man familiar with the Company's computerized inventory and parts system, and a gearman yard-support person, in effect a mechanics helper.

As the workers dispatched from the hiring hall began arriving at the gearlocker building, one of the workers gave Murphy the "dispatch pad" showing that all of the workers were casuals, or entry level workers who are typically the least skilled hiring hall registrants. For that reason, Murphy and Gate Manager Lidstone started interviewing them to determine precisely the skills they claimed to possess.

During the course of these interviews, Ken Elliott, a TMC mechanic represented by Local 8, came into the breakroom and told the worker to stop talking to the managers. Elliott then proceeded out to the gearlocker shop floor and the dispatched workers followed him. Murphy and Lidstone followed. Out on the shop floor Lidstone protested that Elliott had no authority to be involved in the matter because he did not work for the Company. Elliott claimed that he still had the right to speak with the workers as his "brothers" and that Lidstone needed to speak with Local 8 Business Agent Johnson.

By the time Elliott interrupted the interviews, Murphy had talked with nine of the dispatched workers and found that only two certified welders possessed the skills he had requested. For that reason, Murphy returned all 14 of the dispatched workers to the hiring hall at the direction of Terminal Manager Mullen. Before the men actually left the premises, Business Agent Johnson and Local 8 LRC DeLaCruz arrived at the gearlocker shop and spoke with the dispatched workers.

When Johnson and DeLaCruz finished speaking with the dispatched workers, they spoke with Murphy, asking his reasons for rejecting the two welders. Murphy told the union agents that they needed to speak with Mullen, the company official who made the decision to return all of the dispatched workers. A short while later, the Company made the decision to retain the two welders and a certified diesel mechanic. By

---

[26] Lidstone asserted without contradiction that there had not been any fire extinguishers on the motorized loading machines for years.

[27] Based on the evidence before me I respectfully disagree with this finding by the arbitrator.

that time one of the welders had left the premises and could not be reached. In any event, the qualified mechanics provided by the hiring hall was insufficient to complete the repairs on all the equipment taken out of service on June 6.[28] As a result, the terminal remained closed at least during the day shift because it did not have enough operable front-end loaders and reach stackers to warrant opening for business.

An arbitration hearing commenced at 11 a.m. that morning concerning the union's failure to dispatch the qualified mechanics from the hiring hall as requested by the Company. At the conclusion of that hearing, Arbitrator Holmes decided that the Local 8 officers and members created a work stoppage at T6 on the first shift by failing to provide the skilled manpower the Company properly requested. She directed Local 8 to cease such actions and immediately provide the Company with workers having the necessary training and experience to perform the work required by the Company. She also directed the workers to follow the Company's direction concerning their work assignments.

### 9. Complaint paragraphs 6(p) and (v): the June 8 work stoppage resulting from Respondents' refusal to dispatch sufficient workers from the hiring hall

Complaint paragraph 6(p) alleges that Respondents, by Mulcahy, Wilson, and other agents caused a work stoppage at T6 on June 8 by again refusing to provide the Company with qualified mechanics. Complaint paragraph 6(v) makes a similar allegation concerning the Respondents refusal to furnish the Company with loader operators on June 10.[29] Both allegations pertain to Local 8's failure or refusal to dispatch personnel requested by the Company from the hiring hall.

On June 7, Lidstone placed an order with the Local 8 hiring hall asking to have eight loader operators referred for day-shift work the following day. When he confirmed the placement of the order on Local 8's dispatch office recording at about 6 p.m. that day, he also heard the Company's request for 14 mechanics on the day shift the following day.

About 6:30 a.m. on Friday, June 8, Mullen received a call from LRC members Mulcahy and Wilson concerning the number of top loader operators the Company needed that day. When Mullen told them that they had ordered eight, they asked why they needed eight when they did not have that many top loaders running. Mullen responded that the Company also hoped to get mechanics back to repair the out of service loaders. Mulcahy first responded by saying that he had told Mullen yesterday that, in reference to the requested dispatch of the mechanics, "was not going to happen." When Mullen pressed

the two union agents for the referral of three specific loader mechanics, Mulcahy told him that all three were sick.[30]

Later that morning, four top loader operators arrived at T6 for work. Mullen and Lidstone met them and ascertained that it was not likely that others would arrive for work. Lidstone's foreman contacted the Local 8 dispatch office and was told that only those four had signed up for the work. When none of the 14 mechanics requested by the Company appeared for work, Murphy called the dispatch office and was told that there were no qualified mechanics available to send the Company that day. Since the Company only had four loader operators and no mechanics, it closed the gate a 4 p.m. when about 60 trucks were in line to enter.

### 10. Complaint paragraphs 6(r), (s), and (t): the June 9 slowdown and work stoppages

On June 9, officials of the ILWU, Local 8, and Local 40 left a Longshore Division caucus, a coastwise gathering of ILWU members and officials, in San Diego to attend a meeting in Portland.[31] In addition to Sundet, those making this trek included the ILWU President Robert McEllrath, Local 8 officers Smith and Mulcahy, and Local 40 Secretary-Treasurer and Business Agent Dane Jones. Jones estimated that 30 to 40 officials and members of the ILWU, Local 8, and Local 40 attended this meeting in Portland and that no minutes were kept. As seen below, one of the officials in attendance described the purpose of the meeting as one to reinforce the ILWU's support for Local 8's efforts to obtain the T6 dockside reefer work.

Evidence of job actions by workers represented by Local 8 and Local 40 in the immediate aftermath of this obviously significant meeting reflects conduct plainly designed to disrupt the Company's operations at T6. The credible and uncontradicted evidence also shows a declaration by Mulcahy, a responsible Local 8 official who had traveled from San Diego to attend the Portland meeting that day, that the ILWU wanted to "run [the Company] out of town."

(a) Complaint paragraph 6(r) alleges that Respondents' caused a work stoppage on June 9 at T6 in furtherance of its efforts to obtain the dockside reefer work for ILWU workers by encouraging employees to take breaks at the same time rather than at staggered times.

According to Terminal Manager Mullen, there has been a "continuous operation agreement" in effect at T6 for years.[32] The first shift begins at 8 a.m. and ends at 5 p.m. The second

---

[28] Lidstone accused Business Agent Johnson of violating the arbitrator's decision by failing to provide qualified workers that day. Johnson shrugged Lidstone's criticism off, reminding him that the Company had fired its entire work force the day before.

[29] Complaint par. 6(v) mistakenly alleges that the refusal to furnish loader operators occurred on June 10. The evidence shows that the refusal to fill the complete order for the loader operators occurred on June 8.

[30] Two days later, Mulcahy called Mullen offering to refer the three "sick" mechanics requested on June 8 if Mullen dropped the employer complaint against the workers fired for performing the dockside reefer work and made them whole. Mullen refused the offer.

[31] Sundet said this caucus is convened from time to time. He described the caucus as the highest policy making body in the ILWU Longshore Division with authority over all other officials and committees in that labor organization.

[32] Sec. 2.3 of the PCLCD provides that longshoremen are to have "due regard" for "the continuity and nature of the work" when they take their 15-minute breaks. Sec. 2.31 provides that they "shall take their relief as directed by the employer, and there shall be no abuse of . . . relief periods by the employees."

20                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

shift begins at 6 p.m. and ends at 3 a.m.[33]  During each of these shifts, the crews are entitled to three breaks.  The breaks consist of a 1-hour lunchbreak at the end of the first 4 hours of duty, and two 15-minute breaks, one in the middle of the first 4 hours and another in the middle of the last 4 hours.  The entire crew always stops working for the lunchbreak.  However, the parties have adhered to a continuous operation agreement when working on a ship in port.  Under that agreement, the entire crew does not stop for the 15-minute breaks.  Instead, the crew members stagger their 15-minute breaks in order to maintain a continuous flow of containers to and from the ship.

On June 9 two ships, the *Westwood Olympia* and the *Hanjin Geneva*, docked at T6.  The Company worked its first shift crews to unload and load the *Westwood Olympia*.  In the morning, the crews worked a continuous operation through the midmorning break period but the crews did not work through the midafternoon break.  Instead, work on the *Westwood Olympia* came to a halt while all crewmembers stopped work for the midafternoon break.  The crews ignored the Company's directive to go back to work.  The Company utilized three second shift crews to work on the *Hanjin Geneva*.  All crewmembers stopped working at the same time for the two 15-minute breaks during that shift.

(b)  Complaint paragraph 6(s) alleges that on June 9 Respondents encouraged company drivers and crane operators to engage in a slow down at T6 in furtherance of their efforts to obtain the dockside reefer work for workers they represent by operating their equipment at reduced speeds.

Noah Scheidel, the Company's stevedore manager, was on duty at T6 from 4 p.m. on June 9 until about 5 a.m. on June 10.  Early in the shift, Scheidel observed the trucks, cranes, and other equipment used to load and unload the two ships in port moving very slowly.  After observing the slow movement of the Company's equipment for awhile, Scheidel got in his own pickup and followed some of the slow moving company truckdrivers in the container yard.  He clocked several driving 5 miles per hour or less.  Typically, these trucks move at or close to the terminal speed limit of 15 miles per hour.

Terminal Manager Mullen came to T6 at approximately 8:30 p.m. that night and drove around for about an hour observing the slow moving equipment operators before calling a PMA labor relations representative to arrange an immediate hearing before Arbitrator Holmes over the ongoing slow down.  After the hearing, she found the Company was still out of compliance with CLRC-012-2012 but went on to make the following findings about the slowdown:

> 5.  The Union, its officers and members are engaging in a slowdown, tantamount to a work stoppage, in violation of Sections 11.1 and 11.2, PCLCD.
> 6.  The Union is in violation of (a prior arbitration decision) by engaging in job action.
> 7.  The workforce shall return to normal production levels, immediately, and shall maintain normal production levels on all subsequent shifts.

8.  ICTSI shall direct relief periods as stipulated under the terms of the PCLCD.

(GC Exh. 15.)  As seen below, this slowdown continued throughout the weekend into June 11.

(c)  Complaint paragraph 6(t) alleges that Respondents caused a work stoppage at T6 in furtherance of their efforts to obtain the dockside reefer work for ILWU workers when the Company's marine clerks and planners represented by Local 40 failed to notify the Port's electricians about reefers scheduled to arrive and depart on a ship docked at T6 on June 9.

During Scheidel's June 9-10 duty period, the *Westwood Olympia* and the *Hanjin Geneva* were in port.  When a ship calls at the port for unloading and loading, Scheidel said that all of the crews receive a packet from the planners in the marine manager's office who are represented by Local 40 showing "which containers are going to go to and from the ship and how they're going to be positioned . . . [e]ither on the ship or in the yard."  At the start of the second shift that day, the Port's lead electrician notified Scheidel that he had not received the paperwork for the night's work.  For years the planner routinely made a copy of these materials and marked it for the electricians so they know what reefers to plug and unplug during the shift and where those reefers are located.  Upon checking into the matter, Scheidel learned that the night planner had not made a copy for the electricians so he asked that one be made.  That prompted the planner to ask Scheidel if he was "directing" him to do so and Scheidel said that he was.

11.  Complaint paragraphs 6(u), (w), and (x): the June 10 shutdown threat, the slowdown, and the work stoppage

(a) Complaint paragraph 6(u) alleges that on June 10 Local 8 LRC Mulcahy threatened to shut down the stevedore operations unless the Company reassigned the dockside reefer work.

A recess occurred near the conclusion of Arbitrator Holmes' hearing discussed above in connection with complaint paragraph 6(s).  By that time, it was early in the morning of June 10.  During this break while the parties awaited the arbitrator's decision, LRC Mulcahy and Terminal Manager Mullen spoke briefly in a separate room at the T6 administration building.  Mulcahy told Mullen that the ILWU agreed to back Local 8's pursuit of the dockside reefer work at the June 9 meeting attended by those who came from the San Diego caucus meeting and others.  Mullen credibly testified that Mulcahy then said:

> [I]t was their plan to run ICTSI out of town.  He further said that he didn't—they wanted to shut us down and he didn't care if any ships came to Portland again or not, that the ILWU never wanted ICTSI (to) enter into the lease with the Port.  And they do not want us to be members of PMA.

(b) Complaint paragraph 6(w) alleges that Local 8 Business Agent Kevin Johnson caused a slowdown at T6 on June 10 in support of Respondents' dispute with the Port by requiring an unreasonable amount of safety signage beneath the cranes operating at the time.

---

[33] Occasionally, the Company utilizes the shorter 3rd shift authorized by the PCLCD that starts at 3 a.m. and ends at 8 a.m.  The breaks for this abbreviated shift were not described.

The safety committee at T6 specifies the number, the type and the configuration of the safety signage at T6.[34] As of June 10 the safety committee rules required a single A-frame type of sign to be set up at the end of the gangway on the dock when a crane was in operation. That sign stated: "Warning, cranes working overhead." The purpose of the rule was to alert persons going aboard the ship that a crane was in operation above them. It is the responsibility of the gearlocker workers to put out the sign when the crane is in operation.

On the morning of June 10, Marine Manager Yockey spoke to Local 8 Business Agent Johnson at the foot of the gangway about the break schedule that he had prepared for use while the crews worked on the ship in port that day. There is no evidence that Johnson said anything about the absence of the safety sign. At about 8:30 a.m., however, Yockey heard a call over the radio network saying that the business agent was there and that work had to stop because of a health and safety issue. Yockey left the ship and, after finding Johnson near the entrance to the dock office, asked why they were "standing by." Johnson told him they had to stop because the safety signage had not been put up.

Yockey acknowledged that he had not noticed previously whether the sign was in place. In any event, Yockey told a foreman to get someone to put out the safety sign. When that was done, Yockey asked Johnson if it was okay to resume work. Johnson then insisted that another sign be placed at the top of the gangway. Although that was not required by the existing safety policy, Yockey arranged to have an old sign placed at that location. When that was done, Johnson okayed a return to work.

After work had resumed for about half an hour, another radio call directed that work stop again because of a health and safety issue. Yockey again found Johnson who insisted on this occasion that more signs were needed. Although Yockey thought that the added signs Johnson wanted posted along the ship walkway were unnecessary and not required by the safety policy, he directed one of the stevedore managers to make a dozen more signs and post them as Johnson wanted. When that was finished, Johnson insisted that the safety tape be placed along the walkway used by the crews to get to their work area, a measure that had never been done before. After losing about an hour of worktime over Johnson's safety requirements, the crews finally resumed work about midmorning.

(c) Complaint paragraph 6(x) alleges that Respondents' agents caused a work stoppage in support of their dispute with the Port by encouraging Local 8-represented workers to perform the dockside reefer work notwithstanding contrary instructions from company managers.

Stevedore Manager Scheidel again worked the second shift on June 10. Shortly after the second shift started at 6:30 p.m., he arranged to have three of the Company's mechanics assigned to replace a cracked window on one of the cranes scheduled for use on the *Hanjin Geneva*. The window still had not been replaced by approximately 9 p.m., when Scheidel noticed

the three mechanics plugging in reefers in the container yard. He directed them to quit plugging in the reefers and go back to their job replacing the crane window. They ignored his directive. Before the window was finally changed, the crane had been out of service for approximately 4 hours.

*G. The August Complaint Allegations*

The August complaint addresses the conduct of Respondents both before and after the issuance of the Board's 10(k) decision and determination on August 13 awarding the dockside reefer work to the Port's employees represented by Local 48. The allegation in complaint paragraph 7(a) asserts that Respondents continued to "file, process and maintain grievances" against ICTSI, TMC, and six carriers following the Board's August 13 decision.[35] This refers largely to the 83 grievances discussed previously as background for the allegations in the June complaint.

Complaint paragraph 7(b) alleges that the ILWU itself "maintained and refused to withdraw a 'Complaint for Confirmation and Enforcement of Final and Binding Rulings under Collective Bargaining Agreement'" filed against ITCSI in the U.S. District Court for the District of Oregon that sought to compel the assignment of the dockside reefer work to employees represented by Local 8.

Complaint paragraph 7(c) alleges that ILWU Coast Committeemen Sundet and Ortiz threatened *Cosco, Hanjin, Hapag,* and *"K" Line* that Locals 8 and 40 would prosecute pay-in-lieu grievances against each of them if the dockside reefer work was not assigned to ILWU-represented workers.

The parties filed a factual stipulation with multiple exhibits attached pertaining to the August complaint. Based on that stipulation and the attached exhibits, I make the following findings relevant to the allegations in the August complaint:

1. On August 13, 2012, pursuant to Section 10(k) of the Act, the Board issued an award in the *10(k) case* providing that the Port's employees represented by Local 48 are entitled to perform the dockside reefer work at T6.

2. Between March 9, 2012, and August 21, 2012, Respondent Local 8 filed 83 lost-work opportunity grievances against ICTSI, TMC, and several carriers, including *Cosco, Hamburg Sud, Hanjin, Hapag Lloyd, "K" Line,* and *Yang Ming,* seeking reimbursement to employees it represents at T6 because those employees were not assigned to perform the plugging, unplugging, and monitoring of refrigerated cargo containers at T6 (the dockside reefer work).

3. On August 1, 2012, Respondent Local 40 filed a lost-work opportunity grievance against ICTSI seeking reimburse-

---

[34] The members of the safety committee include the terminal manager, the marine manager, other company managers and representatives from the three local unions that represent Longshore workers at T6.

[35] The six carriers are *Cosco North America, Inc.(Cosco), Hamburg Sud North America, Inc.(Hamburg Sud), Hanjin Shipping America, LLC (Hanjin), Hapag Lloyd America, Inc.(Hapag), "K" Line America, Inc. ("K" Line),* and *Yang Ming America Corporation (Yang, Ming).* Each of these carriers along with the Company and TMC had one or more lost-time grievances filed by Local 8 or Local 40 between March and August 2011 that related to the Company's failure to assign the dockside reefer work to the ILWU-represented longshore workers and marine clerks. The Local 40 grievances claim lost-time pay for the recordkeeping aspect of the dockside reefer work performed by Port electricians.

ment to employees it represents at T6 because employees "other than" the employees it represents performed the work of checking in refrigerated cargo containers on July 23, 2012.

4. On August 22, 2012, Mullen[36] sent the PMA and each of the Respondents an email dated August 22, 2012, that (1) demanded that all of the dockside reefer lost-work opportunity grievances "be immediately withdrawn" and (2) requested the PMA to notify Arbitrator Holmes that it would be unnecessary for her to rule on Local 40's lost-work opportunity grievance related to the reefer "check-in" and initial monitoring work then pending before her because the Board awarded that work to Local 48 in the *10(k) case.*

5. On August 22, 2012, Respondent Local 40 Secretary-Treasurer/Business Agent Jones sent Mullen an email stating:

> As we proved by testimony and exhibit in the arbitration hearing of the 7th of this month, the work of cargo receipt is distinct and separate from the disputed plugging, unplugging, and monitoring work for which you solicited the 10(k) hearing , the findings of which have no legal binding upon your business decisions. This distinction has been previously clarified in two coast arbitrations C-202008 and C-6-2008 which are final and binding upon the parties.
>
> Accordingly, ILWU Local 40 expects that you will assign all clerical work relative to the receipt of cargo including checking, inspection, and operationally necessary confirmations of data necessary to perform clerks' work to ILWU Local 40 represented marine clerks.

6. Since August 13, 2012, Respondent Local 8 and Respondent Local 40 have continued to maintain and process the grievances described in paragraphs 2 and 3, above.

7. On June 13, 2012, the ILWU and the PMA filed the "Complaint for Confirmation and Enforcement of Final and Binding Rulings under Collective Bargaining Agreement" (confirmation complaint) against ICTSI with the United States District Court for the District of Oregon seeking confirmation of CLRC-012-2012 and CLRC-013-2012.

8. On August 14, 2012, ICTSI Counsel Michael Garone sent Respondents' counsel Robert Remar an email requesting in light of the Board's decision in the *10(k) case* that: (a) the ILWU-represented mechanics and clerks immediately "stand down" and permit the Port's electricians to perform the dockside reefer work; (b) the ILWU-represented mechanics and clerks take no action to perform the dockside reefer work and refrain from interfering in any way with the performance of that work by the Port and its electricians; (c) confirm immediately that the Respondents intend to abide by the decision in the *10(k) case;* and (d) confirm that the ILWU intends to withdraw the confirmation complaint because it is at variance with the Board's decision in the *10(k) case.*

9. Since August 13, 2012, Respondent International has maintained and has not withdrawn the confirmation complaint.

10. On August 15, 2012, Respondent International, by Coast Committeemen Sundet and Ray Ortiz Jr. sent letters, identical in substance, to S.Y. Kim, managing director of *Hanjin,* Chris

---

[36] By the time he sent this email, Mullen had become ICTSI's director of labor management and terminal services.

von Kannewurff, senior vice president of *"K" Line,* Wolfgang Freese, president of *Hapag,* Lloyd, and Dave Ebert, assistant vice president of *Cosco* that asserted the following: (a) the carriers each had "the primary and ultimate responsibility for all contractual (PCL&CA) handling, maintenance and repair" of their equipment; (b) the fact that ICTSI, the carriers "contractor" at T6, fails to comply with the PCL&CA for whatever reason does not alter their "independent and primary" obligation under the PCL&CA; (c) the decision in the Board's *10(k) case* does not provide their companies with any defense for their violations of the PCL&CA; (d) effective that day, Locals 8 and 40 would prosecute lost work opportunity grievances against them for each refrigerated container if the dockside work of plugg-ing/unplugging and monitoring is "subcontracted" to others outside the PCL&CA bargaining unit.

11. On August 16, 2012, *Hanjin* Senior Vice President of Sales/Marketing Operations Mike Radak sent officials of ICTSI and the Port of Portland an email dated August 16, 2012, with the August 15 Sundet/Ortiz letter attached, demanding that "ICTSI use ILWU labor to service our reefers." The email threatened that their "failure to do so will result in grievances and subsequent fines to (*Hanjin*) by the ILWU . . . (in which event *Hanjin*) will look to ICTSI for compensation on any and all legal costs and financial penalties levied against us by the PMA and ILWU for violating the master contract." The email characterized the situation as "urgent" and ask that the recipients "[a]dvise your concurrence." There is no evidence that the recipients concurred with the demand contained in Radak's email.

### H. Analysis and Conclusions

#### 1. The 8(b)(4)(i) and (ii)(B) allegations

Section 8(b)(4)(B) reflects "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building & Trades Council,* 341 U.S. 675, 692 (1951). Here, the parties sharply disagree about the identity of the primary employer (or "offending") employer and the others that can be characterized as "unoffending" employer that we characterize these days as neutrals.

The AGC contends that the Port is the primary employer based on the right of control test the Board applies to distinguish primary employers from neutral employers in cases of this type. Accordingly, the AGC argues that the various forms of pressure the Respondents asserted against others violated the secondary boycott proscriptions in Section 8(b)(4)(B). Respondents argue that Section 8(b)(4)(B) protects economic action against parties who are not really "neutral" or who are not "wholly uncon-cerned" in a labor dispute such as the one here. Respondents assert that neither ICTSI nor the carriers can be characterized as neutral or wholly unconcerned here because they are bound by the coastwise PCLCD that obligates them to honor the section 1 jurisdictional mandates of that contract document as interpreted in CLRC-012-2012 and CLRC-013-2012 and/or authorized arbitrators. As I find that CLRC-012-

2012 and CLRC-013-2012 suffer from a fundamental flaw, I disagree with Respondents' contentions.

In *Plumbers Local 438 (George Koch Sons, Inc.),* 201 NLRB 59, 63 (1973), enfd. 490 F.2d 323 (4th Cir. 1973), the Board reiterated its analytical approach to cases of this kind:

> . . . [O]f late, the Board has characterized its approach simply in terms of a right-of-control test. The test as stated would seem to imply that the Board looked solely at the pressured employer's "contract right to control" the work at issue at the time of the pressure to determine whether that pressure was primary or secondary. In fact, this is not now the Board's approach nor was it ever.

> [T]he Board has always proceeded with an analysis of (1) whether under all the surrounding circumstances the union's objective was work preservation and then (2) whether the pressures exerted were directed at the right person, i.e., at the primary in the dispute. For the reasons set forth, *supra,* we think this approach fully conforms with *National Woodwork* and is in fact compelled by Section 8(b)(4)(B). In following this approach, however, our analysis has not nor will it ever be a mechanical one, and, in addition to determining, under all the surrounding circumstances, whether the union's objective is truly work preservation, we have studied and shall continue to study not only the situation the pressured employer finds himself in but also how he came to be in that situation. And if we find that the employer is not truly an "unoffending employer" who merits the Act's protections, we shall find no violation in a union's pressures such as occurred here, even though a purely mechanical or surface look at the case might present an appearance of a parallel situation.

That being understood, the right of control test the Board utilizes presumes that an employer is a neutral entitled to the protection afforded under Section 8(b)(4)(B) if "when faced with a coercive demand from its union, (it) is powerless to accede to such a demand except by bringing some form of pressure on an independent third party." *Electrical Workers Local 501 (Atlas Co.),* 216 NLRB 417 (1975). If the "pressured employer cannot himself accede to the union's wishes, the [union's] pressure is secondary because it is undertaken for its effect elsewhere." Id. But an employer who intentionally places himself in such a position in order to avoid his contractual commitments under a union agreement cannot be deemed "an unoffending employer" entitled to the protection of Section 8(b)(4)(B). *Painters District Council No. 20 (Uni-Coat Spray Painting),* 185 NLRB 930 (1970).

### a. The Respondents' work preservation claim

The Respondents assert that its conduct alleged as unlawful by the AGC constituted lawful work preservation activities. In the *10(k) case,* the Board rejected Respondents' work preservation claim, based on its finding that Local 48 workers have been performing the dockside reefer work since 1974. "Where, as here," the Board said, "a union claiming work for employees who have not previously performed it, the objective is not work preservation but work acquisition." Regardless of the potential binding effect of the Board's decision in the *10(k) case* due to the district court's order, the quoted sentence in the Board's

decision comports with long-established precedent the Board cited. Based on this record, I conclude that Respondents lack a valid work preservation claim with respect to the dockside reefer work because it has never been a function performed by the employees they represent at T6. *Sheet Metal Workers Local 27*, 321 NLRB 540 (1996).

Earlier I referred to an Achilles heel affecting the outcome of this case. Essentially, the defect is this: I find there is no valid contractual underpinning for the work preservation claims the Respondents, with the assistance in this instance of their PMA ally, make here.[37] The Respondents' work preservation claims as to the dockside reefer work are grounded in section 1 of the PCLCD along with the 2008 LOU red-circling process as interpreted in CLRC-012-2012 and CLRC-013-2012 and/or authorized arbitrators who operate under the authority of the PMA and the ILWU. A cursory reading of CLRC-012-2012 and CLRC-013-2012 shows that the PMA and the ILWU assert that the fundamental work allocation at T6 was altered by the 2008 LOU. In order to do that, the parties to this contract would need the Port's consent in one form or another and there is no evidence that the Port ever granted its consent.

It is a fundamental tenant of American labor law that the authority of a multiemployer bargaining agency, such as the PMA, is consensual in nature. See, e.g., *Greenhoot, Inc.*, 205 NLRB 250 (1973). Here, the bargaining arrangement on which the PMA and the ILWU rely as the basis for removing the dockside reefer work at T6 from the jurisdiction of Local 48 workers employed by the Port and assigning it to the workers represented by Local 8 was achieved by means of the red-circling process they invented at the bargaining table in 2008. I find the PMA and the ILWU simply had no legally cognizable authority to make such an arrangement between themselves. The Port, which clearly controlled the work at the time, was not a member of the PMA nor was its consent to the LOU arrangement sought and obtained by any other means. Sundet's call to Port agent Pippenger between his Stanford restaurant meeting with Ganda on May 21 and his participation in formulating CLRC-012-2012 on May 23 suggests that he consciously or unconsciously recognized this state of affairs. The fact that neither Pippenger nor any other Port official provided Sundet with the assurance he sought in that call reinforces the conclusion I have reached here that the Port never consented in any manner to the LOU arrangement as to the Portland terminals.

In fact, the Port obviously continued to treat the subject as one over which it retained full control when it entered into the T6 lease with ICTSI in 2010 with provisions that maintained the historical work jurisdiction of the DCTU unions. For this reason, the application of the LOU red-circle arrangement by the PMA and the ILWU to T6 in the manner described in CLRC-012-2012 and CLRC-013-2012 would first require that they have the Port's consent. The fact of the matter is that they did not have that requisite consent in 2008 or at any other relevant time. Hence, I find the LOU arrangement and directives

---

[37] The NLRB has authority to interpret a provisions in a collective-bargaining agreement offered as a defense to an unfair labor practice. *NLRB v. C & C Plywood*, 385 U.S. 421, 425–430 (1967).

reflected in CLRC-012-2012 and CLRC-013-2012 are ineffective at the very least as to the T6 container facility.

Any claim that the Port's consent to the LOU red-circling arrangement at Portland on the basis of the 1984 Port/ILWU agreement would lack merit. The 1984 Port/ILWU agreement, by its terms only bound the Port to the 1984 coastwise agreement. It makes no mention of the Port being bound to any successor coastwise agreement. Hence, entirely aside from the fact that the Port has not employed workers under that agreement for more than two decades, I find that there is no basis on which to conclude that the 1984 Port/ILWU agreement remains viable for any purpose, let alone for the purpose of binding the Port in some convoluted manner to the 2008 LOU red-circling process. *Gem Management Co.*, 339 NLRB 489 fn. 2 (2003) (me too agreements must be strictly confined to their precise terms).

#### b. The primary/secondary issue

I agree with the AGC's contention that the Port is the primary employer based on the Board's right of control test. *NLRB v. Enterprise Assn. of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tub, Ice Machine & Gen. Pipefitters*, 429 U.S. 507. (1977) (*Enterprise Assn.*) (work stoppage by subcontractor's employees over the use of precut and prethreaded pipe in violation of subcontractor's union contract found unlawful secondary activity because the general contractor, who specified the use of the pipe in issue, was the primary employer).

There are striking parallels between the *Enterprise Assn.* case and this situation. Throughout the operation of T6 as a container facility, the Port has always controlled the dockside reefer work. It originally made the decision that the Local 48 electricians would perform that work when it directly operated the Port. Between 1993 and 2011, the Port continued this practice when it used MTC/PA as the stevedore contractor. Finally, when the Port leased the T6 container operation to ICTSI, it carefully reserved the historical practices that developed over the years with respect to the work performed by the constituent unions in the DTCU, including Local 48. No evidence shows that the Port ever relinquished its control at anytime to anyone over the historical practice of using Port electricians to perform the dockside reefer work.

Hence, similar to the situation in *Enterprise Assn.*, Respondents here pressured ICTSI and the carriers in order to achieve effects "elsewhere." The elsewhere in this case could only have been the Port because the Port had always insisted that its own employees represented by Local 48 perform the dockside reefer work. Consequently, Respondents' activities directed against ICTSI and the carriers that are alleged as unlawful under Section 8(b)(4)(B) in the AGC's complaint constituted secondary activity in that it ultimately sought to cause the Port to relinquish its control over the dockside reefer work so that it could be performed by ICTSI's employees represented by Local 8. *Plumbers Local 438 (George Koch Sons, Inc.),* supra at 62–63.

The Respondents' assertions that ICTSI and the carriers are the primary employers under the right of control test lacks merit. Their claim that ICTSI became a primary employer in this dispute when it became a PMA member and thereby obligated

to assign the dockside reefer work in accord with determinations made under the PCLCD is fatally flawed for the reason, discussed above, that the parties to the PCLCD had no authority when they entered into the 2008 LOU red-circle arrangement to restructure the Port's long-established allocation of the dockside reefer work to its own electricians.

But aside from that conclusion, even if one accepts the Respondents' claim that the longshore and marine clerks unit at Portland merged into the coastwise unit when the ICTSI joined the PMA in 2010 and commenced operating T6 in 2011, Local 8 workers have never performed the dockside reefer work at T6. Instead, that work had always been performed by employees in a non-ILWU unit. Nothing about this transition would justify the contraction of the scope of the work performed by the electricians unit given the bargaining history at T6.

In *PCMC/Pacific Crane Maintenance Co.*, 359 NLRB No. 136 (2013) (the *PCMC* case), the ILWU advanced a similar argument to justify its recognition as the representative of a unit of employees in place of another union that historically represented the unit following a change in the employer's identity. The Board rejected the ILWU's claim that the "historical bargaining unit did not survive the transfer of the unit work from (the old employer to the new employer) and that the (old employer's mechanics) were lawfully merged into the ILWU-PMA bargaining unit." In the Board's view, the traditional community-of-interest factors survive such changed circumstances when it comes to determining whether a historically recognized unit remains appropriate for bargaining. In such cases, the Board accords significant weight to the parties' history of bargaining and a party claiming that changed circumstances overcome a long bargaining history has the burden of proving that there are compelling reasons sufficient to overcome the significance of a long bargaining history. Id. slip op. at 6.

Unlike the *PCMC* case, which involved an entire unit, this case involves only a small segment (10 percent according to the electricians' job description) of the unit work performed historically by the Local 48-represented Port employees. Still, the mere fact that ICTSI joined the PMA and became subject to a collective-bargaining agreement concluded in mid-2008 without any apparent regard for the historical bargaining relationships at Portland does not strike me as satisfying the "compelling circumstances" burden articulated in *PCMC* that would justify the absorption of work duties historically performed by workers in another unit. This is especially true where, as here: (1) the Port specifically sought to preserve the integrity of the Local 48 unit work (and that of the other DCTU organizations) in the T6 lease documents; (2) numerable other comparable situations were "red-circled" at other West Coast terminals and have been allowed to continue under the terms of the LOU; and (3) neither the Port nor its contract stevedores had standing in 2008, or at any other time, to participate in negotiating the LOU red-circling arrangement. As I have concluded that ICTSI did not become duty bound to assign the dockside reefer work to employees in the longshore unit when it joined the PMA, I find Respondents' reliance on ICTSI's PMA membership as a basis for concluding that ICTSI is a primary employer lacks merit. This argument is largely indistinguishable from the claim made

and emphatically rejected by the Supreme Court long ago in the *Sand Door* case.[38]

The Respondents also argue that the right to control the dockside reefer work rests with the carriers because of their ownership interest in the reefers. I also reject this claim. Though it is true that the carriers own or lease all of the reefers, they purchase available terminal services necessary to load, unload and store their containers from the terminal owners or operators. Until the carriers in this case began receiving threats that the ILWU would file grievances against them unless they took steps to insure that the dockside reefer work was performed by ILWU labor, there has never been any attempt by the carriers to interfere with the entrepreneurial decisions of the terminal service providers at T6 concerning which work groups performed what service dockside. If so, those efforts would presumably have been memorialized in the terminal tariffs the Port published that controlled terminal service charges in the absence of a special terminal service agreement which the major carriers that pickup and deliver containers at Portland have negotiated. Respondents' have pointed to nothing in these terminal service agreements that would warrant the conclusion that the carriers mere ownership interest in the containers enabled them to define for the terminal operator what work group could perform what function dockside. Accordingly, I also reject Respondents' claim that the carriers qualify as primary employers under the Board's right of control test.

Finally, a few of Respondents' witnesses claimed that the lease protections for the DCTU's historical work were a subterfuge designed to avoid the PCLCD section 1 requirement that all maintenance and repair work including the dockside reefer work at Portland be assigned to ILWU workers. The record contains absolutely no support for a claim of this sort. To the contrary, the record shows that the Port established those protections in early drafts of the lease published during the RFQ period that occurred well in advance of its direct negotiations with ICTSI. Simply put, there is no evidentiary basis for a conclusion that the DCTU provisions in the T6 lease agreement were deliberately hatched by ICTSI in order to avoid the assigning the dockside reefer work to ILWU represented employees.

### c. The 8(b)(4)(i) and (ii) conduct

The Respondents' conduct set forth in subsection F, above, constitutes inducement of employees and coercion of employers within the meaning of Section 8(b)(4)(i) and (ii). *Longshoremen Assn. Local 1248,* 195 NLRB 273, 274 (1972). The credible evidence supporting all but seven of the allegations reflects direct leadership and participation in these activities by one or more persons admitted to be an agent of the Respondents. Other than the allegations of threats that Sundet made to Ganda at their airport meeting, Respondents did not seriously contest any of the AGC's evidence concerning the 8(b)(4)(i) and (ii) conduct. And as I credit Ganda's account about the threatening language Sundet used at this meeting over Sundet's denials, I include these threats in this finding.

As to the other seven allegations—6(c) (the June 1 and 3 slowdowns); 6(f) (TMC worker Correll performing the plug-in work); 6(l) (blocking access to reefers for loading); 6(m) (self-assignment activity by 13 mechanics resulting in their termination); 6(r) (breach of the continuous work arrangement with a ship in port); 6(t) (the deliberate failure by the planner to prepare paperwork for Port electricians); and 6(x) (the self-assignment to dockside reefer work that delayed the replacement of a crane window)—I find the evidence sufficient to infer that the employee conduct in these instances was induced and encouraged by Respondents' agents even though a specific agent(s) cannot be identified in connection with these actions. Such a conclusion is warranted for these reasons: (1) Correll's statement that his direction to perform the dockside reefer work "came from the top"; (2) Respondents' agents directly engaged in a variety of threats and other actions that had an objective consistent with the activities by the individual employees in these seven instances; (3) the complete absence of evidence that any aspect of this dispute is attributable to a spontaneous employee uprising; and (4) the evidence establishing that Respondents' agents condoned insubordinate employee conduct present in these instances coupled with conduct by Respondents' agents that reinforced the impact of the employee activity by, for example, refusing to dispatch qualified workers from the hiring hall to replace workers terminated for outrageously insubordinate conduct.

In a nutshell, I find that Respondents, in an effort to secure the reassignment of the dockside reefer to workers represented by Local 8, threatened ICTSI officials on May 21, 24, and 25 with adverse consequences if they did not accede to the reassignment demand, and then orchestrated a systematic sabotage of ICTSI's operations at T6 between June 1 and 10 that also adversely affected the operations of the carriers. In fact, some carriers chose to bypass Portland altogether because of the effects of the slowdowns and work stoppages at T6.

### d. The object of Respondents' conduct

Having concluded that Respondents lack a valid work preservation defense, that the Port is the primary employer under the Board's right of control test, and that the nature of Respondents' conduct between May 21 and June 10 fits (i) and (ii) proscriptions of Section 8(b)(4)(B), the only remaining question is whether Respondents' engaged in the conduct described in section F, above, for a "cease doing business" object.

To satisfy the cease doing business object required under Section 8(b)(4)(B), it need only to be shown that the union's secondary activities sought to alter the way in which the primary employer traditionally operates. *NLRB v. Operating Engineers Local 825,* 400 U.S. 297, 304–305 (1971). Accordingly, it is enough to establish violation here if the Respondents engaged in secondary activities in order to cause the Port to abandon its historical practice of using its own electricians to perform the dockside reefer work.

Respondents conduct here had an unlawful cease doing business object within the meaning of Section 8(b)(4)(B). Their activities between May 21 and June 10 pressured ICTSI and the carriers—all neutral employers—to seek the relinquishment of the Port's control over the dockside reefer work for the benefit

---

[38] *Carpenters Local 1976, v. NLRB,* 357 U.S. 93, 105 (1958).

26                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

of the ILWU-represented workers at T6. To achieve this end would require that ICTSI and the Port renegotiate the provisions in the T6 lease requiring the lessee to honor the traditional work assignments that the Port sought to maintain at the terminal. Failing a change in the lease terms or some other accommodation from the Port, the Respondents, as was threatened on June 9, planned "to run ICTSI out of town." By engaging in conduct disruptive of the operations of ICTSI and the carriers at T6 in order to cause the Port to relinquish its control over the dockside reefer work, Respondents violated Section 8(b)(4)(i) and (ii)(B) as alleged. *Plumbers Local 438 (George Koch Sons, Inc.),* supra.

### 2. The 8(b)(4)(i) and (ii)(D) allegations

With respect to the 8(b)(4)(D) allegations, the AGC contends that the Board's decision in the *10(k) case* settled the dockside reefer work assignment against Respondents. Accordingly, counsel for the AGC argues that the Respondents' continued pursuit of the dockside reefer work by processing grievances filed before and after the decision in the *10(k) case*, the court action seeking affirmation of CLRC-012-2012 and CLRC-013-2012, and the demands and threats against the carriers after the decision in the *10(k) case* violates Section 8(b)(4)(D). Respondents concede that they have not withdrawn their pending lawsuit against ICTSI because the unfair labor practice route is the only means by which they can test the Board's decision in the *10(k) case*. However, Respondents contend that the Board's 10(k) determination does not bar them from pursuing their contractual remedies against the carriers for money damages resulting from the subcontracting of the dockside reefer work in violation of the PCLCD.

Based on the rationale in *Longshoremen ILWU Local 32 (Weyerhauser Co),* 271 NLRB 759 (1984), enfd. 773 F.2d 1012 (9th Cir. 1985), cert denied 476 U.S. 1158 (1986), I have concluded that Respondents violated Section 8(b)(4)(D) by filing and processing the pay-in-lieu grievances whenever the Port's electricians performed the dockside reefer work at T6 from March 20l2 onward. And, as noted in that case, the Board's 10(k) decision takes precedence over the contractual dispute resolution mechanisms reflected in CLRC-012-2012 and CLRC-013-2012. For this reason, I find Respondents further violated Section 8(b)(4)(D) by filing and maintaining the lawsuit in the Federal district court for the unlawful, self-serving purpose of obtaining the court's affirmation of the decisions made in CLRC-012-2012 and CLRC-013-2012 that undermine the Board's award in the *10(k) case*. *Bill Johnson's Restaurants Inc. v. NLRB*, 461 U.S. 731 fn. 5 (1983). Hence, my recommended remedial order will require Respondents to withdraw this lawsuit.

Respondents' contend that the Board's 10(k) determination here does not bar them from pursuing contractual remedies against the PMA carriers whenever the Port's electricians perform the dockside reefer work on their containers at T6. This argument is based on a variety of Board and court cases finding that a union does not violate Section 8(b)(4)(D) following the issuance of a 10(k) award by pursuing pay-in-lieu grievances against employers not involved with the disputed work assignment covered by the Board's award. See, e.g. *AGC Oregon-*

*Columbia Chapter v. Operating Engineers Local 701*, 529 F.2d 1395, 1397–1398 (9th Cir. 1976), cert. denied 429 U.S. 822 (1976); *Miron v. Operating Engineers Local 139*, 44 F.3d 558, 567 (7th Cir.1995); *Hutter v. Operating Engineers Local 139*, 862 F.2d 641, 645 (7th Cir.1988); *Sheet Metal Workers Local 27 (E. P. Donnelly)*, 357 NLRB No. 131 (2011); and *Carpenters Local 33 (AGC of Massachusetts)*, 289 NLRB 1482 (1988). Respondents argue that the holdings by the courts and the Board in these cases establish its right to pursue contractual remedies against the PMA carriers, the owners or lessees of all the reefers involved, separate from ICTSI based on their failure to require the use of ILWU labor to perform the dockside reefer work in accord with PCLCD section 1 as interpreted in CLRC-012-2012 and CLRC-013-2012.

I find those cases factually distinguishable from the situation here. They all involve subcontracting practices in the construction industry. Unlike the situation found here, the right to control work assignments almost always pass with the subcontract without altering the permanent business structures. As a result, the cases Respondents cite reflect instances where it is possible for a separate, identifiable cause of action to arise under the separate collective-bargaining agreements of the contractor and its subcontractor. In that setting, the contractor need only to be more careful when choosing the next subcontractor or when drafting the terms of a particular subcontract.

An entirely different structure exists at T6. Contrary to Respondents contention, there is no "subcontracting" arrangement. Instead, the business structure established between the Port and ICTSI is a long-term lease agreement, a real estate arrangement for a portion of the Ports' marine terminals which memorializes the requirement that the lessee adhere to traditional work assignments that had been in effect at the T6 for the previous four decades. This business structure, seemingly common in the industry because the Port was supposedly the last to adopt it, is dependent for its economic vitality on the willingness of the carriers in the shipping industry to use the stevedore services provided at T6. Under Respondents' theory, it can be anticipated that there will be thousands of the disputed work assignments each year during the 25-year lease term, each giving rise to a separate pay-in-lieu grievance that would be highly destructive. Whatever else may be said of the arrangement at T6, it is not one that involves subcontracting on a container-by-container basis.

As a practical matter, the result sought by Respondents would compel the PMA carriers to either: (1) forego doing business altogether at T6 (as some did for limited periods at the height of this dispute); (2) pay an unending monetary exaction to the ILWU workers at T6 because they are not permitted to do the dockside reefer work at T6; or (3) pressure the Port and ICTSI to alter their T6 lease agreement to permit longshore workers represented by Local 8 to perform the dockside reefer work. The economic pressure that would likely result from a variety of sources should the carriers opt for either the first or second option would inevitably lead them to insist on the third option (as some have already done), which would effectively drive a dagger straight through the heart of the Board's 10(k) award concerning the dockside reefer work at T6. Hence, I conclude that importing the rule applied in construction indus-

try cases cited by Respondents to this situation would effectively nullify the Board's award in the *10(k) case*.

In addition, as I have previously found, the parties to the PCLCD never received proper authorization from the Port to enter into their 2008 LOU arrangement on which they rely to gobble up the Port's historically-exercised right to assign the dockside reefer work (or see to it that it is so assigned) to its own employees represented by Local 48. This conclusion, deeply rooted in the Board's well-established policies applicable to multiemployer collective bargaining relationships, rationally compels the finding I now make that Respondents simply have no contractual foundation that the Board must or should recognize for their pursuit of monetary damages against the PMA carriers under the PCLCD for abiding by the existing dockside reefer work assignments. Accordingly, I find Respondents violated Section 8(b)(4)(ii)(D) as alleged by pursuing pay-in-lieu grievances and the lawsuit against the PMA carriers who have done business at T6 after ICTSI commenced operations there in 2011 under its lease with the Port.

### Conclusions of Law

1. The Port is a person within the meaning of Section 2(1) and Section 8(b)(4) of the Act.

2. ICTSI, TMC, COSCO, *Hanjin, "X" Line, Hamburg Sud*, and *Hapag Lloyd* are persons and employers within the meaning of Section 2(1), (2), and Section 8(b)(4) of the Act.

3. ILWU, Local 8, Local 40 (collectively Respondents), and Local 48 each are a labor organization within the meaning of Section 2(5) of the Act

4. By threatening or impliedly threatening to shut down or otherwise disrupt ICTSI's operations at Terminal 6 in Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port or any other person, Respondents have engaged in unfair labor practices affecting commerce within the meaning of Section 8(b)(4)(ii)(B), and Section 2(6) and (7) of the Act.

5. By failing and refusing to fulfill ICTSI's timely requests for the referral of qualified employees for work at Terminal 6 in accord with the Pacific Coast Longshore and Clerks Agreement in order to force or require ICTSI or any other person to cease doing business with the Port or any other person, Respondents have engaged in unfair labor practices affecting commerce within the meaning of Section 8(b)(4)(ii)(B) and Section 2(6) and (7) of the Act.

6. By inducing and encouraging employees to withhold their services, to engage in slowdowns and work stoppages, or to interfere with the lawful and proper work assignments of other employee groups that perform services at Terminal 6 in Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port or any other person, Respondents have engaged in unfair labor practices affecting commerce within the meaning of Section 8(b)(4)(i) and (ii)(B) and Section 2(6) and (7) of the Act.

7. By filing, processing, maintaining and prosecuting grievances or lawsuits or threatening to engage in such conduct against ICTSI, COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud North America, Inc., and Hapag Lloyd America Inc.*, in order to force

or require any of them or any other similarly situated neutral employers or persons to cease doing business with the Port, Respondents have engaged in unfair labor practices affecting commerce within the meaning of Section 8(b)(4)(ii)(B) and Section 2(6) and (7) of the Act.

8. By filing, maintaining, and prosecuting grievances or lawsuits or threatening to engage in such conduct against ICTSI, COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud North America, Inc., and Hapag Lloyd America Inc.*, or other similarly situated neutral employers or persons in order to force or require the Port to assign the dockside reefer work at T6 to employees who are members of, or represented by, Respondent Local 8, rather than to employees who are members of, or represented by, Local 48, Respondents have engaged in unfair labor practices affecting commerce within the meaning of Section 8(b)(4)(ii)(D) and Section 2(6) and (7) of the Act.

### Remedy

Having found that the Respondents have engaged in certain unfair labor practices, my recommended order will require that they cease and desist therefrom and take certain affirmative action designed to effectuate the policies of the Act.

The June and August complaints both request that Respondents be required to "post Notices at all International Longshore and Warehouse Union and its Locals' offices/facilities in Oregon, and to mail copies of said Notices to all of Respondents' members working in Oregon from March 1, 2012 to the present." The AGC's brief provides no rationale in support of this statewide remedial request and no supporting evidence was adduced at the hearing.

There are several local unions affiliated with the ILWU in the State of Oregon in addition to Locals 8 and 40 involved in this case. An ILWU website[39] lists the following: Local 5 in Portland serving warehouse, retail, and allied warehouse workers; Local 12 in North Bend serving longshore workers; Local 28 in Portland serving security officers; Local 50 in Astoria serving longshore workers; Local 53 in Newport serving longshore workers; and Local 92 in Portland serving walking bosses and foremen. Although there is evidence pertaining to the walking bosses and foremen from Local 92 in this case, there is no evidence that they participated in any manner in the unfair labor practices found above. And there is no evidence that any officers or members of any other ILWU local union in Oregon were involved in this dispute. In the absence of evidence showing some form of participation by the other Oregon local unions in the unfair labor practices involved here, I deny the AGC's request that these other local unions be required to post the notices on behalf of the ILWU and Locals 8 and 40. The notice posting requirement will be limited to the facilities of the ILWU, and Locals 8 and 40.

The AGC also seeks to have signed copies of the notices furnished to the PMA and the neutral employers doing business at T6 during the relevant time period for posting if they so chose. Accordingly, my recommended order will require that each of the Respondents furnish signed copies of the notice for posting

---

[39] See http://www.ilwu.org/?page_id=315.

28                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

to PMA, ICTSI, TMC, COSCO North America, Inc., *Hanjin Shipping America, LLC,* **"X" Line America, Inc., Hamburg Sud North America, Inc.,** and *Hapag Lloyd America Inc.*

The proposed notice to members attached to the AGC's brief contains certain instructive language to the Respondents' agents and to the PMA and PMA carriers. I reject the AGC's request to include this language in the notice to members on the ground such instructions are not appropriate for inclusion in a notice to members.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[40]

ORDER

The Respondents, International Longshore and Warehouse Union, AFL–CIO, San Francisco, California, International Longshore and Warehouse Union, Local 8, AFL–CIO, Portland, Oregon, and International Longshore and Warehouse Union, Local 40, AFL–CIO, Portland, Oregon, their officers, agents, and representatives, shall

1. Cease and desist from

(a)  Inducing and encouraging employees of ICTSI Oregon, Inc. (ICTSI) to withhold their services, engage in slowdowns and work stoppages, or interfere with the lawful and proper work assignments of other employee groups that perform services at Terminal 6 in Portland, Oregon, in order to force or require ICTSI, any sea-going carrier using the services provided at terminal 6, or any other person to cease doing business with the Port of Portland at terminal 6.

(b)  Directly or indirectly threatening in any manner to shut down or otherwise disrupt ICTSI's operations at terminal 6 in Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port of Portland at its terminal 6.

(c)  Failing and refusing to fulfill ICTSI's timely requests for the referral of qualified employees for work at terminal 6 in accord with the Pacific Coast Longshore and Clerks Agreement in order to force or require ICTSI or any other person to cease doing business with the Port at Terminal 6.

(d)  Filing, processing, maintaining and prosecuting grievances or lawsuits or threatening to engage in such conduct against ICTSI, Terminal Maintenance Corporation (TMC), COSCO North America, Inc., *Hanjin Shipping America, LLC,* **"X" Line America, Inc., Hamburg Sud North America, Inc.,** and *Hapag Lloyd America Inc.,* or any other similarly situated neutral employer using the services provided at terminal 6, Portland, Oregon, in order to force or require any of them or any other neutral employers or persons to cease doing business with the Port of Portland.

(e)  Filing, maintaining, processing, and prosecuting grievances or lawsuits or threatening to engage in such conduct against ICTSI, TMC, COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud North America, Inc.,* and *Hapag Lloyd America Inc.,* or other

similarly situated neutral employers or persons in order to force or require the Port of Portland to assign the work of plugging, unplugging, and monitoring the conditions of the refrigerated containers while positioned on the dock at Terminal 6 to employees who are members of, or represented by, Respondent Local 8, rather than to employees who are members of, or represented by, the International Brotherhood of Electrical Workers, Local 48, AFL–CIO.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  Within 14 days from the date of this order, withdraw the Complaint for Confirmation and Enforcement of Final and Binding Rulings under Collective-Bargaining Agreement filed against ICTSI Oregon, Inc. in the Federal District Court for the District of Oregon.

(b)  Within 14 days after service by the Region, post at their offices in Portland, Oregon, and San Francisco, California, copies of the attached notice marked "Appendix."[41]  Copies of the notice, on forms provided by the Regional Director for Region 19 after being signed by the Respondents' authorized representatives, shall be posted by the Respondents and maintained for 60 consecutive days in conspicuous places including all places where notices to members are customarily posted.  In addition to physically posting the paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or on an internet site, and/or other electronic means, if the Respondents customarily communicate with their members or the employees it represents by such means.  Reasonable steps shall be taken by the Respondents to ensure that the notices are not altered, defaced, or covered by any other material.

(c)  Sign and return to the Regional Director sufficient copies of the notice for physical and/or electronic posting by ICTSI Oregon, Inc., TMC, COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud,* and *Hapag Lloyd America Inc.,* if willing, at all places or in the same manner as notices to employees are customarily posted.

(d)  Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondents have taken to comply.

Dated, Washington, D.C.  August 28, 2013

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

WE WILL NOT induce or encourage employees of ICTSI Oregon, Inc. (ICTSI) to withhold their services, engage in slow-

---

[40]  If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[41]  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

downs and work stoppages, or interfere with the lawful and proper work assignments of other employee groups that perform services at Terminal 6 in Portland, Oregon, in order to force or require ICTSI, or any sea-going carrier to cease using the services provided at Terminal 6..

WE WILL NOT directly or indirectly threaten in any manner to shut down or otherwise disrupt ICTSI's operations at Terminal 6, Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port of Portland at Terminal 6.

WE WILL NOT fail and/or refuse to fulfill ICTSI's timely requests for the referral of qualified employees for work at Terminal 6 in accord with the Pacific Coast Longshore and Clerks Agreement in order to force or require ICTSI or any other person to cease doing business with the Port at Terminal 6.

WE WILL NOT file, process, maintain and/or prosecute grievances or lawsuits, or threaten to engage in such conduct against ICTSI, Terminal Maintenance Corporation (TMC), COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud North America, Inc.,* and *Hapag Lloyd America Inc.,* or any other similarly situated neutral employer at T6, in order to force or require any of them or any other neutral employers or persons to cease doing business with the Port of Portland.

WE WILL NOT file, maintain, process, and/or prosecute grievances or lawsuits, or threaten to engage in such conduct, against ICTSI, TMC, COSCO North America, Inc., *Hanjin Shipping America, LLC, "X" Line America, Inc., Hamburg Sud North America, Inc.,* and *Hapag Lloyd America Inc.,* or other similarly situated neutral employers or persons in order to force or require the Port to assign the work of plugging, unplugging, and monitoring the conditions of the refrigerated containers while positioned on the dock at Terminal 6 to employees who

are members of, or represented by, Respondent Local 8**,** rather than to employees who are members of, or represented by, the International Brotherhood of Electrical Workers, Local 48, AFL–CIO.

WE WILL NOT in any like or related manner induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in a strike or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is to: (1) force or require any person to cease using, selling, handling, transporting, or otherwise dealing in the product s of any other producer, processor, or manufacturer, or to cease doing business with any other person; or (2) force or require any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class.

WE WILL withdraw the Complaint for Confirmation and Enforcement of Final and Binding Rulings under Collective Bargaining Agreement filed against ICTSI Oregon, Inc. in the Federal District Court for the District of Oregon.

> INTERNATIONAL    LONGSHORE    AND    WAREHOUSE UNION, AFL–CIO
>
> INTERNATIONAL    LONGSHORE    AND    WAREHOUSE UNION, LOCAL 8, AFL–CIO
>
> INTERNATIONAL    LONGSHORE    AND    WAREHOUSE UNION, LOCAL 40, AFL–CIO

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28.1(a)(1), the undersigned counsel for Petitioners/Cross-Respondents in the above-captioned matter submits this Certificate of Parties, Rulings, and Related Cases.

## A.    Parties and Amici.

1.    International Longshore and Warehouse Union and International Longshore and Warehouse Union Locals 8 and 40 (collectively "ILWU") are the Petitioners/Cross-Respondents.

2.    The National Labor Relations Board ("Board") is the Respondent/Cross-Petitioner.

3.    ICTSI Oregon, Inc. ("ICTSI") was a Charging Party in the proceeding before the Board, and is an Intervenor-Respondent in this appeal.

4.    Port of Portland ("Port") was a Charging Party in the proceeding before the Board and filed an *amicus curiae* brief in support of the Board.

5.    Pacific Maritime Association ("PMA") has filed an *amicus curiae* brief in support of ILWU.

6.    North America's Building Trades Unions ("NABTU") and the International Association of Machinists and Aerospace Workers, AFL-CIO, have jointly filed an *amicus curiae* brief in support of the Board as to the "right to control" issue.

52

**B.     Rulings Under Review.**

ILWU seeks review of the Board's Decision and Order in *International Longshore and Warehouse Union, et al.*, Case No. 19-CC-100903, reported at 363 NLRB No. 12 (September 24, 2015).

**C.     Related Cases.** The case has not been previously before this Court or any other court. As of the date of this filing, ILWU is aware of the following other cases pending before another federal court of appeals involving substantially the same parties and the same or similar issues as the instant case:

1.     *ILWU, et al. v. NLRB*, 15-1443 and 16-1036 (D.C. Cir.);

2.     *ILWU, et al. v. ICTSI Oregon, Inc.*, 14-35504 (9th Cir.); and

3.     *Ronald K. Hooks, on behalf of the NLRB, v. ILWU, et al.*, No. 12-36068 (9th Cir.).

To the best of counsel's knowledge, no other related cases are currently pending in this Court or in any other federal court of appeals, or in any other court in the District of Columbia.

Dated: December 20, 2017          LAW OFFICE OF ROBERT REMAR

                                By:     /s/ Robert S. Remar
                                        Robert Remar

                                *Attorneys for Petitioners,*
                                ILWU *and* ILWU LOCALS 8 and 40

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners/Cross-Respondents ILWU make the following disclosures:

International Longshore and Warehouse Union is an unincorporated association constituting a labor union under federal labor law.

International Longshore and Warehouse Union, Locals 8 and 40 are unincorporated associations constituting labor unions under federal labor law and affiliated with the International Longshore and Warehouse Union.

Dated: December 20, 2017                LAW OFFICE OF ROBERT REMAR

                                        By:     /s/ Robert S. Remar
                                                Robert Remar

                                                *Attorneys for Petitioners,*
                                                ILWU *and* ILWU LOCAL 8 AND 40

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of the Columbia Circuit by using the appellate CM/ECF system.

I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 20, 2017          LAW OFFICE OF ROBERT REMAR

By:     /s/ Robert S. Remar
        Robert Remar

        *Attorneys for Petitioners,*
        ILWU *and* ILWU LOCAL 8 AND 40